673 So.2d 1329 (1996)
Adeline Strohe KING et al., Plaintiffs-Appellants,
v.
Richard W. STROHE et al., Defendants-Appellees.
No. 95-656.
Court of Appeal of Louisiana, Third Circuit.
May 8, 1996.
*1331 William Howard Collier, Reginald J. Ringuet, Lafayette, for Adeline Strohe King et al.
Gregg Lindsey Spyridon, Metairie, for Richard W. Strohe et al.
Howell Arlistus Dennis, Jr., Baton Rouge, for Whitson Group.
John A. Gordon, New Orleans, for Denovo Group.
Before KNOLL, COOKS and SAUNDERS, JJ.
KNOLL, Judge.
There are three issues presented for appeal in this complex mineral dispute. The first issue is whether the trial court erred in finding that the parties to an exchange of real property executed in 1965 intended to reserve a servitude of use of irrigation canals then existing on the property. The second issue concerns the applicability of La.R.S. 30:10(A)(3) to the facts of this case. The third issue is whether a mineral lessee, having waived its warranty claims against its lessors, can recover for overpayments of royalties to the lessors under the theory of payment of a thing not due.

FACTS
Thomas R. Strohe owned large tracts of land in Jefferson Davis Parish. In particular, he owned a large contiguous tract made up of the South Half of Section 10, the West Half of Section 14, and the East Half of Section 15, Township 10 South, Range 4 West. After his death in 1963, the property was owned in indivision by members of his family. His sister, Adeline Strohe King (Mrs. King) owned a ¼ interest in the tract. The remaining ¾ interest was held by his children, Richard W. Strohe, Thomas W. Strohe, Rhetta S. Duey, and Bonita S. Cabico, and by his wife, Cecily D. Strohe (now Morgan), (collectively referred to as the Strohe Group). This tract was used mainly for rice farming, and it was criss-crossed by canals.
Soon after the death of Thomas R. Strohe, his family wanted to partition the property. In 1965, they called Mr. Clarence Romero, their family attorney, and instructed him to draft an act of exchange. The Strohe Group, Mrs. King, and Mr. Romero testified that the parties intended to create two separate tracts, one for Mrs. King, and one for the Strohe Group. It was decided that Mrs. King would exchange her ¼ share in the parent tract for full surface ownership of the South Half of Section 10. The Strohe Group exchanged its ¾ interest in the parent tract for full surface ownership of the property in Sections 14 and 15. The parties to the exchange stated that they wanted to reserve their mineral rights to the property and their rights to the canals that were necessary for irrigation of the rice crop. The interpretation of this exchange is the primary source of the parties' dispute.
Mr. Romero drafted the exchange and the parties signed it. In the exchange, Mrs. *1332 King transferred all her undivided ownership in Sections 14 and 15, "[l]ess and except her interest in and to all irrigation wells, canals, laterals and other irrigation channels existing on said lands." In return, the Strohe Group transferred its ownership in Section 10, "[l]ess and except their interest in and to all irrigation wells, canals, laterals and other irrigation channels existing on said lands." Both Mrs. King and the Strohe Group also reserved their mineral rights.
Minerals were discovered on the property, and numerous leases were signed by both the Strohe Group and Mrs. King. In 1981, some landmen took out oil and gas leases on an area in the East Half of Section 15. There is an irrigation canal that runs from south to north across the East Half of Section 15. The land lying to the west of this canal is the subject of the present dispute, and will be herein referred to as the "disputed tract." The landmen took leases on the disputed tract from the Strohe Group, but they did not take leases from Mrs. King. DeNovo, Inc. (DeNovo) is the successor in interest of these 1981 leases.
In 1984, DeNovo began production of minerals from a unit that included the disputed tract. DeNovo was the unit operator and it paid out shares of production to the parties who held working interests and overriding royalty interests in the unit. The production was divided just as if Mrs. King's mineral servitude on the disputed tract had prescribed. This meant that the share previously held by Mrs. King was divided between the Strohe Group and DeNovo as the lessee of the Strohe Group.
In 1988, Summit Land and Abstract (Summit) was taking out some leases in the area for Louisiana Land and Exploration. Summit, in its search of the public records, realized that Mrs. King might have an unleased interest in the unit. Summit took the position that Mrs. King's servitude had never prescribed and it approached Mrs. King and her son, Robert King, about the possibility of suing to get the mineral servitude recognized. Years earlier, Mrs. King had conveyed a royalty interest in the disputed tract and other lands to Robert King. Mrs. King granted a lease to Summit on the disputed tract on July 25, 1988. The lease executed by the parties was retroactively dated, however, and it reflected an effective date of January 1, 1984, a few months before production of the unit had commenced.
In February of 1990, Mrs. King, Robert King, and Summit sued the Strohe Group, DeNovo, and numerous other parties who held working interests in the unit that included the disputed tract. They sought an accounting and reimbursement for their share of the unit's production. The Strohe Group filed an answer admitting Mrs. King's mineral servitude for the disputed tract. DeNovo asserted a cross claim based on breach of warranty against its lessor, the Strohe Group.
DeNovo filed a motion for summary judgment in which it asserted that the reason Mrs. King was not included in the lease was because her mineral servitude for the parcel to the west of the canal prescribed from ten years' non-use in 1975. DeNovo relied upon the plain language of the 1965 exchange, which conveyed the parties' interests in the parent tract "[l]ess and except their interest in and to all irrigation wells, canals, laterals and other irrigation channels existing on said lands." Since prior to the exchange, Mrs. King had owned a ¼ ownership interest in the canals, it was DeNovo's contention that Mrs. King had reserved her ¼ ownership interest in the canals. This would mean that the land covered by canals had its own separate identity of ownership apart from the lands transferred by Mrs. King and the Strohe Group in the exchange. This separate ownership of the canals would have the effect of dividing the property into several noncontiguous mineral servitudes. DeNovo asserted that the separately owned canal in Section 15 cuts off the disputed tract from the land where there had been drilling operations sufficient to interrupt prescription.
The plaintiffs, on the other hand, contended that the parties to the partition intended only to reserve a servitude of use of the canals. This would mean that the disputed tract is contiguous with the tract where drilling occurred, and that prescription was therefore interrupted.
*1333 The trial court granted summary judgment in favor of DeNovo, finding that the 1965 exchange was unambiguous in reserving a "fee ownership" of the irrigation system. In King v. Strohe, 602 So.2d 219 (La.App 3 Cir.), writ denied, 607 So.2d 558 (La.1992), the Third Circuit Court of Appeal reversed, finding that the exchange was ambiguous with respect to the intent of the parties. The case was then remanded for further proceedings to determine the intent of the parties to the exchange.
The parties made several stipulations on remand such that there was only one issue presented to the trial court. If the court found that the parties to the 1965 exchange intended to reserve an ownership interest in the canals, then Mrs. King's servitude for the disputed tract would have prescribed in 1975. If, on the other hand, the parties intended to reserve only a servitude of use of the canals, then her mineral interest would have been maintained in the disputed tract. In addition, DeNovo waived its claims of breach of warranty against the Strohe Group.
After a two day trial in July, 1993, the judge found that the evidence preponderated in favor of the plaintiffs. The trial court held in extensive written reasons that the parties to the 1965 exchange had intended to reserve only a servitude of use of the canals. He further found La.R.S. 30:10(A)(3) was applicable to the facts of the case. La.R.S. 30:10(A)(3) states:
"If there is included in any unit created by the commissioner of conservation one or more unleased interests for which the party or parties entitled to market production therefrom have not made arrangements to separately dispose of the share of such production attributable to such tract, and the unit operator proceeds with the sale of unit production, then the unit operator shall pay to such party or parties such tract's pro rata share of the proceeds of the sale of production within one hundred eighty days of such sale." (Emphasis added).
Accordingly, the judgment held DeNovo solidarily liable as unit operator and awarded interest dating from 180 days of the sale of production.
At DeNovo's request, the trial court subsequently granted a new trial on the applicability of La.R.S. 30:10(A)(3). DeNovo argued that since the Summit lease had a retroactive date of 1984, that Mrs. King was not an unleased interest. The trial court held that La.R.S. 30:10(A)(3) was inapplicable. Accordingly, the judgment was amended to reflect that DeNovo was liable only for its virile share of the judgment as a working interest owner. The judgment was also amended awarding interest from the date of judicial demand rather than within 180 days of sale of production, which dates back to 1984. The trial court also ruled that DeNovo could recover overpayments erroneously made to the Strohe Group under the doctrine of "payment of a thing not due" (La.Civ.Code art. 2301).
DeNovo has appealed the trial court's finding that the parties intended to reserve a servitude instead of full ownership. Plaintiffs appeal the trial court's ruling that La. R.S. 30:10(A)(3) does not apply to this case. The Strohe Group appeals the trial court's decision to hold them liable for the overpayments they received from DeNovo.

INTENT OF THE PARTIES
The interpretation of a contract is the determination of the common intent of the parties. La.Civ.Code art. 2045. The first step in interpretation is how the parties have expressed their intent through the words used in the contract. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La.Civ.Code art. 2046. When the words used in a contract are ambiguous, however, the intent of the parties must be reconstructed in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. La.Civ. Code art. 2053.
In the case sub judice, the Third Circuit Court of Appeal determined in King v. Strohe, 602 So.2d 219 (La.App 3 Cir.), writ denied, 607 So.2d 558 (La.1992), that the *1334 provision reserving the parties' interest in the irrigation system was ambiguous. Therefore, the trial court was required to reconstruct the parties' intent as provided in La.Civ.Code art. 2053.
The trial court considered several different types of evidence in determining the intent of the parties.
The trial court considered the live and deposition testimony of the parties to the exchange, and the testimony of Mr. Claude Romero, who drew the exchange. Their testimony indicated that it was always the parties' intent to reserve a servitude of use of the canal system. They stated that it was the intent of the parties to have a complete partition of the parent tract and that neither Mrs. King nor the Strohe Group wanted to own any part of the other's land. They also indicated that they wanted everyone to share in the minerals from the entire property. The record also indicates that neither Mrs. King nor the members of the Strohe Group had any knowledge of Louisiana law with respect to property or mineral rights when they executed the exchange.
The court also considered several documents executed by the parties to the 1965 exchange that aver that the parties' intent was to reserve a servitude of use of the irrigation system rather than an ownership interest in the canals. Although these documents were executed in anticipation of litigation, the trial judge noted that the documents were not self-serving with respect to the Strohe Group since they were defendants in the litigation.
Defendants submitted several oil and gas leases executed by the parties to show that the parties intended to reserve ownership interests in the canals. These leases, executed after 1975, covered areas both east and west of the canal. The leases showed that while the Strohe Group leased areas both east and west of the canal, Mrs. King did not lease areas west of the canal. With these leases, DeNovo intended to show that Mrs. King and the Strohe Group realized that Mrs. King's mineral servitude had expired, and that therefore, they must have known that they had transferred full ownership of the canals.
Plaintiffs, on the other hand, submitted leases executed by Mrs. King after 1975. These leases cover parts of the disputed tract and do not distinguish between lands east and west of the canal. Plaintiffs also point to Mrs. King's donation of a mineral royalty interest covering the East Half of Section 15, including the disputed tract. They assert that she would have not donated those royalty interests had she known that her servitude had expired.
The trial court stated that it carefully reviewed these leases and considered the parties' arguments with respect to them. The trial court noted that several of the landmen who took the leases testified that they never asked the parties what their intent was with respect to the reservation of their interest in the canals. Further, the court noted that several of the landmen said that they simply copied descriptions contained in previous leases and that any mistakes in the previous leases were copied into their leases. The court concluded that the leases were insufficient to prove the parties' intent to reserve ownership interests in the canal.
The defendants also produced documents that they asserted showed that Mr. Romero knew that the parties had reserved an ownership interest in the canals. First, they produced a royalty deed signed by Richard Strohe in 1984. This royalty deed reflected the parties' interests in the East Half of Section 15. It divided the land into three tracts: east of the canal, west of the canal, and the canal itself. The royalty deed reflected fractional mineral interests just as if Mrs. King's mineral servitude had prescribed. The defendants asserted that Mr. Romero reviewed the royalty deed before Richard Strohe signed it and that he therefore approved of the division of the mineral interests contained therein. Mr. Romero stated that he did not see the royalty deed until after it was signed. Richard Strohe also testified that he did not present the royalty deed for Mr. Romero's review before signing it. The trial court believed Mr. Romero and Mr. Strohe.
The defendants also pointed to a letter written in 1985 by Mr. Romero to another *1335 attorney, Mr. Alan Katz. Mr. Katz was an attorney for GoldKing Production Co., and was familiar with the interests held by the Strohe Group and Mrs. King. Mr. Romero requested a "breakdown" of the mineral interests held by the Strohe family. In his response to Mr. Romero's request, Mr. Katz differentiated between the lands lying east of the canal, lands lying west of the canal, and the canal itself. Mr. Katz's breakdown of fractional mineral interests reflected that Mrs. King's servitude west of the canal had prescribed. Mr. Romero took no action in response to this letter. The defendants asserted that Mr. Romero's inaction reflected his tacit agreement with Mr. Katz about the prescription of Mrs. King's servitude. The trial court discounted the letter's importance, finding that since it requested the breakdown of the Strohes' interests, it did not specifically request information regarding Mrs. King's interest. It held that the letter and Mr. Romero's inaction with respect to it was insufficient to prove the parties' intent to reserve full ownership of the canals.
Finally, the defendant introduced an affidavit of possession executed in December, 1984, by Mr. Romero and Mr. Leroy Hebert. The affidavit discussed the history of ownership of Section 15 and the topography, farming, and mineral activities thereon. The affidavit contains a seven-line sentence that specifically addresses the reservation of the irrigation canals. The affidavit states:
The retention of the ownership of the irrigation system which crosses through the East Half (E ½) of section 15, Township 10 South, Range 4 West, by Adeline Strohe King, Richard W. Strohe, Rhetta Strohe Duey, Bonita Strohe Cabico, and Thomas W. Strohe, had the effect of creating separate tracts either side of the irrigation system which were no long [sic] contiguous to one another, and in effect resulting in the minerals reserved by Adeline Strohe King to revert to the then property owner(s).
While Mr. Romero admitted that his signature was on the document, he vehemently denied that the above seven-line sentence was in the document when he signed it. The other affiant, Mr. Hebert executed an affidavit after the close of trial which stated that the document was exactly as it was when he signed it in 1984. Nevertheless, when trial was reopened on August 17, 1993, for the purpose of taking his testimony about the document, he admitted that he could not say for certain that the document was the exact one that he signed in 1984. He further admitted that he could not say that the seven-line sentence was included when he signed the document.
Document experts obtained by both plaintiffs and defendants examined the document and noted several irregularities in it. Significantly: (1) The first two pages of the document were photocopies while page 3, which contained the above sentence, and page 4, containing the signatures, were typewritten originals; (2) the experts were unable to conclusively determine whether page 3 was or was not a part of the document at the time page 4 was signed; (3) page 3, containing the seven-line sentence above, has exactly seven more lines than the other fully typed page of the document. The trial court carefully considered all evidence concerning the disputed affidavit and made the following finding:
As noted above, Mr. Romero was quite adamant in his testimony that the 7-line sentence was not in the document when he signed it. The Court finds Mr. Romero to be a credible witness. Therefore, after considering all of the evidence regarding the Possession Affidavit, the Court finds that no weight should be given to it in determining the intent of the parties in executing the Act of Exchange.
We note that of the three documents, only one was executed by a party to the 1965 exchange. There is no indication in the record that Mrs. King or the other members of the Strohe Group had any knowledge of these documents. As a result, these documents are only marginally indicative of the parties' subjective intent. They are more relevant for the purpose of determining the credibility of Mr. Romero. We also note that the trial court found Mr. Romero to be a credible witness.
The trial court then applied jurisprudence that addresses the specific issue of whether parties to a transfer of immovables intended *1336 to transfer the property in full ownership or whether they merely intended to transfer a servitude. In Porter v. Acadia-Vermilion Irrigation Co., 479 So.2d 1003 (La.App. 3 Cir.1985), writ denied, 483 So.2d 1019 (La. 1986) we stated that the following factors should be considered:
1. The consideration recited in the deed;
2. Whether a specific measurement was given to the "right of way";
3. Whether the party claiming the fee title had an actual need for such title;
4. To whom the property was assessed and who paid the taxes on the property;
5. Whether the grant was made for a specific purpose;
6. Whether the grant was made "in perpetuity" or "forever";
7. How the parties to the conveyance, or their heirs and assigns, have treated the property.
Porter, 479 So.2d 1003 at 1007, citing: Meaux v. Southdown Lands, Inc., 361 So.2d 974 (La.App. 3rd Cir.1978); Sohio Petroleum Company v. Hebert, 146 So.2d 530 (La.App. 3rd Cir.1962), writ ref., 243 La. 1004, 149 So.2d 763 (1963).
We note that several of the above factors apply to the case sub judice. First, the record reflects that although the irrigation system was extensive, no attempt was made to describe its location or dimensions. This reflects favorably upon the plaintiffs, since ownership interests would be difficult to enforce absent a proper description. It stands to reason that if one owned portions of another's estate, one would want to know the exact location and dimension. A right of use, like the predial servitude of drawing water, burdens the entire servient estate and therefore requires no precise property description for its application. We also note that no provision was made in the event that the canals had to be moved or filled in.
The parties had no need for full ownership interests in the canals to conduct their farming operations. The record reflects that there was a need for flexibility in the irrigation system: the canals changed locations; some were filled in; new canals were dug; and some were replaced by pipelines. Mrs. King only needed access to the canals that supplied water to her land. She had no use for the smaller canals and laterals that supplied the Strohe Group's fields. The reservation of full ownership interests in the canals would constitute an unnecessary intrusion into the ownership interests of the parties. Significantly, the parties to the exchange said that they wanted a complete partition of the property so that neither party would own any of the other's land.
Although the right of use is a personal servitude, articles interpreting predial servitudes may be applied to the extent that their application is compatible with the rules governing right of use. La.Civ.Code art. 645. Doubt as to the existence, extent, or manner of exercise of a predial servitude shall be resolved in favor of the servient estate. La.Civ.Code art. 730. This means that any doubt should be resolved in a manner that least restricts ownership of the servient estate. This court finds that the servitude of use would provide the necessary flexibility while least restricting the ownership of the respective servient estates.
The trial court further found that the canals were not assessed separately from the larger tracts for property tax purposes. Also, the acreage covered by the irrigation system was not included for the purpose of dividing crop shares. This reflects the parties' intent to reserve a servitude rather than an ownership interest.
Although the exchange does not state that the reservation was for the specific purpose of drawing water, we feel that the specific inclusion of the parts necessary for irrigation reflects the parties' intent to limit the reservation to irrigation purposes.
Much of the evidence submitted at trial concerned how the parties to the exchange have treated the property in the years subsequent to its execution. While the parties surface activity indicates that the parties considered themselves full surface owners of their respective estates, DeNovo points to their execution of mineral leases as evidence *1337 of their intention of reserving ownership interests in the canals.
For several reasons, we feel that the parties execution of mineral leases is not indicative of their intent in executing the exchange in 1965. First, the record reflects that the parties to the 1965 exchange did not have even a rudimentary knowledge of Louisiana mineral and property law. They have no understanding of the subtle differences between servitudes and ownership, and their impact on mineral estates. Therefore, it is unreasonable to infer from the breakdown of mineral interests in documents executed years after the exchange that the parties intended to reserve an ownership interest rather than a servitude of use. The record also reflects that dozens of different leases were executed by the parties, and that many leases were executed in multiple originals so that the signor of each lease could not easily determine which of the others were included in it. It is also important to note that Mrs. King executed leases covering the disputed tract after her servitude had allegedly prescribed. Finally, the record indicates that it was the landmen and not the lessors who decided the breakdown of the ownership interests in the leases. Although Mr. Romero testified that he reviewed the leases for form, he stated that it was the landman's job to decide who to take leases from. Therefore, we believe that these leases demonstrate little about the Strohe Group's intent in the 1965 exchange, and they are even less useful in proving Mrs. King's intent.
In Rosell v. ESCO, 549 So.2d 840 (La.1989) the Louisiana Supreme Court provided the following review of the findings of the trier of fact:
It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.
* * * * * *
Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. In applying the manifestly erroneousclearly wrong standard to the findings below, appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo.
When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
Rosell, 549 So.2d 840 at 844-845. (Citations omitted).
While the ultimate determination of the parties' intent is a mixed question of fact and law, the determination of the subjective intent of the parties to the exchange is a question of fact, and the trial court's determination of the parties' subjective intent is entitled to great weight. The trial court had the opportunity to hear the testimony firsthand, and it had an opportunity to view the demeanor of the witnesses. Therefore, the trial court's credibility determinations should not be lightly disregarded.
It is apparent from our review of the record and the extensive written reasons for judgment, that the trial judge carefully and thoughtfully considered all the evidence adduced. It is also apparent that he gave significant weight to the statements of Mr. *1338 Romero and the parties to the 1965 exchange. We have thoroughly reviewed the record and agree with the findings of the trial court. It is apparent that the parties wanted to have a complete partition of the surface estate of the parent tract. The reservation of ownership of an extensive system of canals, laterals, and wells is simply inconsistent with the parties stated intent for a complete partition. Furthermore, we find that the factors set down in Porter v. Acadia-Vermilion Irrigation Co., 479 So.2d 1003, reflect the parties' intent to reserve a servitude rather than full ownership in the canals. Therefore, we affirm the trial court's holding that the 1965 exchange reserved a servitude of use rather than an ownership interest in the canals.

APPLICABILITY OF La.R.S. 30:10(A)(3)
The legislature has specifically set out the rights of unleased interest owners in La.R.S. 30:10(A)(3) which provides:
If there is included in any unit created by the commissioner of conservation one or more unleased interests for which the party or parties entitled to market production therefrom have not made arrangements to separately dispose of the share of such production attributable to such tract, and the unit operator proceeds with the sale of unit production, then the unit operator shall pay to such party or parties such tract's pro rata share of the proceeds of the sale of production within one hundred eighty days of such sale.
At first, the trial court held that La.R.S. 30:10(A)(3) applied to the facts of this case. In a retrial on this issue, however, the trial court reversed its earlier decision and decided that the retroactive lease between Mrs. King and Summit precluded the application of the statute.
Defendants assert that since La.R.S. 30:10(A)(3) applies only to unleased interests, and since there is a lease between Mrs. King and Summit retroactively dated January 1, 1984, the statute has no application in this case. They assert that Mrs. King intentionally changed her status retroactively from an unleased interest to a leased interest.
Plaintiffs, on the other hand, claim that the agreement between Mrs. King and Summit was not a lease for purposes of the statute. They state that all conditions for DeNovo's liability had been met and that Mrs. King had acquired valuable vested rights under the statute. They assert that it should be seen solely as an assignment of Mrs. King's rights under La.R.S. 30:10(A)(3).
La.R.S. 30:10(A)(3) allows the operator of a unit to market the production of the unit even if he has no contractual relationship with the mineral interest owners in the unit. The trade-off for this statutory authorization is that it creates an obligation in which the unit operator is required to pay the parties entitled to market production their pro-rata share of the proceeds of the sale within 180 days of such sale. The statute affords a greater protection to unleased owners than is enjoyed by mineral lessees.
When all mineral interests in the unit are leased, the lessees are merely entitled to a pro rata share of production from the unit. The lessees are owners under La. R.S. 30:3(8), and have the exclusive right to their share of production. This share can be delivered in cash or in kind, but lessees are only entitled to share in the cash proceeds of the sale of production in certain situations. See Hunt Oil Co. v. Batchelor, 93-3144 (La.10/17/94); 644 So.2d 191.
La.R.S. 30:10(A)(3) was enacted for the benefit of both the unit operator and the unleased interest. It protects the unleased interests and avoids undue delays in the sale of production. Leased interests are usually entitled to only an in kind share of production, which they then market. It is then the lessee's duty to distribute the proceeds under its contract with its lessor. When there is no lessee, the mineral interest owner must deal directly with the unit operator, with whom he has no contractual relationship. In order to facilitate the sale of the minerals, La.R.S. 30:10(A)(3) provides a quasi-contractual relationship between the unit operator and the mineral interest owner. See Taylor v. David New Operating Co., Inc., 619 So.2d 1251 (La.App. 3 Cir.), writ denied, 625 So.2d 1046 (La.1993).
*1339 The obligation that arises from this relationship is personal and heritable in nature, rather than a real obligation. A real obligation arises simply from ownership or possession of a thing burdened by a real right. See La.Civ.Code art. 1763. The obligation created by La.R.S. 30:10(A)(3) requires more, namely a sale of unit production. DeNovo has already proceeded with the sale of the unit production, triggering the obligation, and it now seeks to nullify that obligation based on the retroactive application of the Summit lease.
Both parties cite Taylor v. Woodpecker Corp., 539 So.2d 1293 (La.App. 3 Cir.1989), in support of their arguments. In Taylor, a landowner (Taylor) sued his lessee Woodpecker), the unit operator (Wentworth), and the purchaser of production for the unit (Ashland). In a settlement agreement, Woodpecker executed a retroactive release of its lease in favor of Taylor. Taylor then sought an accounting from Wentworth and Ashland. Both defendants filed exceptions of no right of action asserting that Woodpecker had the exclusive right to proceed against them for the production occurring prior to the release, and that the retroactive release of the mineral lease was insufficient to retroactively assign Woodpecker's rights to Taylor. The trial court granted the defendants' exceptions. The Third Circuit Court of Appeal reversed, finding that in light of the particular circumstances surrounding its execution, the retroactive release also operated as an assignment of Woodpecker's rights against Wentworth and Ashland.
In the case sub judice, the plaintiffs cite Taylor in support of their assertion that the lease between Mrs. King and Summit assigned Mrs. King's rights under La.R.S. 30:10(A)(3). In Taylor, the release stated "[t]hat the undersigned ... hereby releases, relinquishes and forever quitclaims any and all rights whatsoever acquired...." The lease executed by Mrs. King states that it will "immediately attach to and affect any and all rights, titles, and interests in the above described land, including reversionary mineral rights, hereafter acquired by or inuring to Lessor and Lessor's successors and assigns." Although the language of the Summit lease could be interpreted as conveying only a real right, the retroactive dating of the lease indicates that the parties intended to transfer more than the mere prospective rights normally granted by an oil and gas lease. It indicates that the parties also intended to transfer the right to seek an accounting under La.R.S. 30:10(A)(3). We agree with plaintiffs that the language in the lease executed by Mrs. King is sufficient, considering the circumstances, to transfer Mrs. King's rights under La.R.S. 30:10(A)(3) to Summit. Nevertheless, we refuse to completely disregard the document's effect as a lease. Since Summit's rights under the assignment are ultimately derivative of Mrs. King's rights, we must examine the extent of her rights under La.R.S. 30:10(A)(3).
The defendants cite Taylor in their assertion that the lease should be given retroactive effect for purposes of La.R.S. 30:10(A)(3). The landowners in Taylor asserted that the retroactive release placed them in the position of unleased interests for purposes 30:10(A)(3). This is in spite of the fact that their land was leased during the time for which they demanded an accounting. The defendants in Taylor did not contest the issue of the effect of the release for purposes of La.R.S. 30:10(A)(3). Whether the retroactive release was sufficient to change the landowners' status from a leased to an unleased interest was not properly addressed in any of the Taylor cases. See Taylor v. Woodpecker Corp., 562 So.2d 888 (La.1990) at Fn 3.
We note that since Taylor was a leased interest for the period preceding the release, no protection was afforded to him under La.R.S. 30:10(A)(3) during the existence of the lease. While the release could operate as a transfer of the obligation owed to Woodpecker, it could not have the effect of retroactively terminating the lease for purposes of La.R.S. 30:10(A)(3). Instruments affecting immovable property affect third parties only from the date of recordation. Therefore, although the release could transfer Woodpecker's rights to Taylor, the release could not retroactively change Taylor's status with respect to Wentworth and Ashland for purposes of La.R.S. 30:10(A)(3). La.Civ.Code *1340 art. 1839; La.R.S. 9:2721. Therefore we now address whether the lease executed between Mrs. King and Summit should be given retroactive application for purposes of determining Mrs. King's status under La.R.S. 30:10(A)(3).
Before signing the Summit lease, Mrs. King had vested rights under La.R.S. 30:10(A)(3). She was an unleased interest entitled to market the production from the unit well, and she had not made arrangements to separately dispose of her share. For several years, DeNovo sold her share of the unit production and did not distribute the pro rata share of proceeds to her. These rights arose from the personal and heritable obligation owed to Mrs. King as a result of the quasi-contractual relationship dictated by La.R.S. 30:10(A)(3). See Taylor, 619 So.2d 1251.
Agreements involving immovable property affect third parties only after they are filed for recordation. La.Civ.Code art. 1839. Although the lease may have retroactive effects between the parties to it, the document is a nullity with respect to third parties until recordation.
La.R.S. 9:2721 states:
No sale, contract, counter letter, lien, mortgage, judgment, surface lease, oil, gas or mineral lease, or other instrument of writing relating to or affecting immovable property shall be binding on or affect third persons or third parties unless and until filed for registry in the office of the parish recorder of the parish where the land or immovable is situated. Neither secret claims or equities nor other matters outside the public records shall be binding on or affect such third parties.
Furthermore, DeNovo had the benefit of the proceeds of the sales of production, even as they steadfastly denied Mrs. King's and Summit's demands. In fact, Mrs. King's mineral servitude was not recognized by the defendant until November, 1988, when the Strohe Group executed an affirmation or reconveyance of Mrs. King's interest. Even then, the defendant recognized Mrs. King's interest only subject to its own lease, which had been recorded before the reconveyance. It is also significant to note that the production from the unit well has now virtually stopped.
We decline to give the lease between Mrs. King and Summit retroactive application for purposes of La.R.S. 30:10(A)(3). Having previously held that Mrs. King's servitude had been continuously in existence since 1965, we find that her interest has been unleased for the purposes of La.R.S. 30:10(A)(3) from the start of unit production until the date of recordation of the Summit lease. La.R.S. 30:10(A)(3) specifically addresses cases like the one sub judice. Its primary purpose is the protection of the interests of the unleased landowner when there is a sale of unit production. DeNovo benefitted from the provisions of the statute when it sold the production attributable to Mrs. King. Therefore, we find that DeNovo is solidarily liable under La.R.S. 30:10(A)(3). Accordingly, the judgment of the trial court in which it found La.R.S. 30:10(A)(3) inapplicable to the case sub judice is reversed.

PAYMENT OF A THING NOT DUE
DeNovo originally filed a cross claim against the Strohe Group to recover overpayment of royalties. These royalties were mistakenly paid by DeNovo to the Strohe Group for the mineral interests that were actually held by Mrs. King. DeNovo sought recovery based on theories of breach of warranty, detrimental reliance, unjust enrichment, and payment of a thing not due. DeNovo subsequently dismissed with prejudice its claims for breach of warranty and detrimental reliance.
The trial court considered DeNovo's remaining theories of recovery, and decided that the Strohe Group was liable for overpayment of royalties based on the theory of payment of a thing not due. The trial court cited Matthews v. Sun Exploration and Production, 521 So.2d 1192 (La.App. 2 Cir.1988) which provided for recovery of mistakenly paid royalties under the theory of payment of a thing not due.
The Strohe Group appeals, asserting that DeNovo's waiver of its warranty claims *1341 precludes its recovery based on the theory of payment of a thing not due. The Strohe Group points out that La.R.S. 31:120 provides for an implied warranty of title in mineral leases, and also provides for a waiver of that warranty. Under La.R.S. 31:120, the lessee's recovery is limited to the money paid out to the lessor under the lease. Therefore, under the breach of warranty provisions, DeNovo could have recovered all bonuses, rentals, and royalties paid under the lease. The Strohe Group asserts that DeNovo waived its right to recovery of all of these funds when it dismissed with prejudice its warranty claim. We disagree.
La.Civ.Code art. 2301 provides that he who has received that which is not due him, whether through error or knowingly, obliges himself to restore it to him from whom he has unduly received it. La.Civ.Code art. 2302 provides that he who has paid through mistake, believing himself to be a debtor, may reclaim what he has paid. These articles are particularly applicable to the case sub judice.
We note that under a breach of warranty claim, the Strohe Group could be liable for all rents, royalties, and bonuses paid under the lease, not merely the portion of the royalties that were rightfully due Mrs. King. We therefore distinguish between recovering all royalties, rents, and bonuses paid under the lease, and merely recovering those funds that were due Mrs. King and mistakenly paid to the Strohe Group. Although DeNovo waived its claim under the implied warranty provision of the Mineral Code, it did not waive its rights to recovery under Civil Code Articles 2301 et seq. We see no reason why the Strohe Group should gain a windfall at the expense of DeNovo. Therefore, the judgment of the trial court granting recovery of funds mistakenly paid by DeNovo to the Strohe Group is affirmed.

CONCLUSION
For the foregoing reasons, the trial court's finding that the parties to the 1965 exchange intended to reserve a right of use of the canal system rather than full ownership interests in the portions of the property on which the canals were located is affirmed. The trial court's holding that La.R.S. 30:10(A)(3) is inapplicable is reversed, and the case is remanded to the trial court for a determination of the amount due. That portion of the trial court's judgment in favor of DeNovo on the grounds of payment of a thing not due is affirmed. The case is remanded to the district court so that judgment can be amended and rendered in accordance with the views expressed herein. Costs of this appeal are assessed one-half to plaintiffs and one-half to defendants.
AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.