# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-KA-02000-COA

BRYN ELLIS                                                                          APPELLANT

v.

STATE OF MISSISSIPPI                                                               APPELLEE

DATE OF JUDGMENT:                10/04/2013
TRIAL JUDGE:                     HON. WILLIAM A. GOWAN JR.
COURT FROM WHICH APPEALED:       HINDS COUNTY CIRCUIT COURT
ATTORNEYS FOR APPELLANT:         W. ELLIS PITTMAN
                                 WILBERT L. JOHNSON
ATTORNEY FOR APPELLEE:           OFFICE OF THE ATTORNEY GENERAL
                                 BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:               ROBERT SHULER SMITH
NATURE OF THE CASE:              CRIMINAL - FELONY
TRIAL COURT DISPOSITION:         CONVICTED OF MURDER AND
                                 SENTENCED TO LIFE IN THE CUSTODY
                                 OF THE MISSISSIPPI DEPARTMENT OF
                                 CORRECTIONS
DISPOSITION:                     AFFIRMED – 12/15/2015
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE IRVING, P.J., MAXWELL  AND FAIR, JJ.**

**IRVING, P.J., FOR THE COURT:**

¶1.     A jury sitting before the Hinds County Circuit Court found Bryn Ellis guilty of

murder.  The circuit court sentenced Ellis to life in the custody of the Mississippi Department

of Corrections.  Ellis appeals and claims the circuit court erred when it allowed the

prosecution to introduce an unavailable witness's prior testimony.  Ellis also claims that the

circuit court improperly allowed the prosecution to introduce hearsay statements into

evidence. Finally, Ellis claims the prosecutor made an improper comment during closing arguments. Finding no error, we affirm.

FACTS

¶2. On March 8, 2010, Barry Odom was killed in the parking lot outside of his apartment in Jackson, Mississippi. Aside from a 9:48 p.m. call to 911, Barry's cell phone indicated that he had been talking to Cheryl McGee shortly before his death. Cheryl told authorities that Ellis killed Barry.

¶3. Ellis and Cheryl had been involved in a romantic relationship before Cheryl dated Barry. Ellis and Cheryl began seeing each other in 2006. Their daughter was born in 2007. During his relationship with Cheryl, Ellis was living with Katie Roberts, whom he had been seeing since 1996. However, in late 2008 or early 2009, Cheryl ended her relationship with Ellis. According to Cheryl, Ellis did not want the relationship to end.

¶4. Cheryl began dating Barry during 2009. Cheryl later testified that Ellis had followed her after he discovered that she was seeing Barry. Cheryl also testified that Ellis had threatened to kill her and Barry if they did not stop seeing each other. Cheryl and Barry continued to see each other while taking steps to avoid Ellis.

¶5. Ellis learned about Cheryl's relationship with Barry after he followed her to Barry's house. Cheryl decided to go back to her own home after Barry told her that Ellis had followed her. While Cheryl was on her way home, Ellis pulled out of a gas station and followed her. When Cheryl arrived at home and got out of her car, Ellis confronted her and told her to get in his van. Cheryl complied. Ellis took Cheryl to a hotel room, where they

2

began to argue. According to Cheryl, Ellis had been drinking. Because she was afraid of Ellis, who was armed with a pistol, Cheryl faked an asthma attack and told Ellis that she needed to go home to get her inhaler. Ellis drove Cheryl to her house, but he did not let her leave his van until the next morning. Cheryl testified that on numerous occasions, Ellis threatened to kill her and Barry if he saw them together. Cheryl did not believe that Ellis was serious about his threats, but she and Barry took precautions to avoid Ellis.

¶6.     On March 8, 2010, Cheryl and Barry planned to meet at a hotel after they got off work. They planned to meet at a hotel to avoid Ellis, who knew where Barry lived. Before Cheryl met Barry at the hotel, she let Ellis park his van at her house and she took him to his own home.[1] Because Ellis was running late, Cheryl called him and said they needed to meet because she had plans that night. After dropping Ellis off at his house, Cheryl met Barry at the hotel sometime between 7:00 and 8:00 p.m.

¶7.     Approximately an hour later, Cheryl left the hotel to pick up a prescription and check on her daughter. Cheryl planned to meet Barry after she put her daughter to bed. Later, Cheryl called Barry's cell phone, but he did not answer.

¶8.     At approximately 10:00 p.m., Barry's neighbor, Justin Smith, found Barry lying in the parking lot of the apartment complex where they lived. Barry had been shot twice in the chest. Unfortunately, emergency responders were not able to save him. Authorities contacted Cheryl because her phone number was the last one that Barry had called. Cheryl implicated Ellis in Barry's death.

---

[1] Cheryl allowed Ellis to park his van at her house to avoid repossession.

¶9. Ellis was indicted and charged with murder. He pled not guilty and went to trial. The prosecution called twenty witnesses during its case-in-chief. Most significantly, Cheryl testified to her experiences with Ellis while she was seeing Barry. Barry's friend, Jeffrey Miller, testified that Barry had been followed by an ex-boyfriend of a woman that he had been seeing. Another friend, Thomas Knight, testified similarly. Barry's sister, Stacey Jones, testified that Barry had told her that he was being harassed by an ex-boyfriend of a woman that he had been seeing. According to Stacey, Barry had borrowed a pistol from her because he was concerned that the ex-boyfriend "was going to harm him."

¶10. Katie, who lived with Ellis, testified that he was gone for several hours on the night that Barry was killed. Jennifer Childs testified that on the night of March 8, 2010, Ellis told her that "he [had] shot someone [in the chest] because they had a confrontation going on." Jennifer further testified that the confrontation was "over by Chastain school and between some cars." Officer Patrick Drake, a crime-scene investigator with the Jackson Police Department, testified that Barry's apartment was on Chastain Drive, and Barry's body was found near his car. Ray Clark, the custodian of records for Ellis's cell-phone provider, testified that someone had used Ellis's cell phone to make calls within the vicinity of Barry's apartment on the night that Barry was killed. Additional aspects of the prosecution's case will be discussed as necessary below.

¶11. After the prosecution rested its case-in-chief, Ellis chose not to testify and rested without calling any witnesses. As previously mentioned, the jury found him guilty of murder. Ellis appeals.

DISCUSSION

I.      *Deposition Testimony*

¶12.    Forensic pathologist Dr. Feng Li performed Barry's autopsy.  After a number of continuances, Ellis's trial was scheduled for October 2, 2013.  According to the prosecution, on September 10, 2013, it first learned that Dr. Li's schedule conflicted with Ellis's trial date.[2]   Because Ellis's trial attorney refused "to stipulate to the autopsy that Dr. Li performed," on September 11, 2013, the prosecution filed a motion to allow Dr. Li to testify through a video deposition.   The prosecution's motion also stated: (1) Dr. Li would be in Jackson during the week of September 16, 2013, to testify in a different trial; (2) Ellis's trial had been pending for approximately three years; and (3) the prosecution had made arrangements for a different witness to travel from California so she could testify at Ellis's trial.  The prosecution scheduled a hearing on its motion on September 13, 2013.

¶13.    Ellis's trial attorney objected and argued that he did not have enough time to research and respond to the prosecution's motion.  After the hearing, the circuit court granted the prosecution's motion.  Dr. Li was deposed on September 18, 2013.  The trial judge was present during the deposition, and Ellis's trial attorney cross-examined him. The prosecution played Dr. Li's deposition immediately before it rested its case-in-chief.

¶14.    On appeal, Ellis claims Dr. Li should not have been allowed to testify by video deposition because he was not "unavailable."  We are mindful that "[t]he admissibility of evidence rests within the discretion of the trial court." *Armstrong v. State*, 771 So. 2d 988,

---

   [2] Dr. Li planned to leave the country on September 30, 2013, and he would not be returning for three weeks.

996 (¶36) (Miss. Ct. App. 2000). However, the trial court must exercise its discretion "within the scope of the Mississippi Rules of Evidence, and reversal will be appropriate only when an abuse of discretion resulting in prejudice to the accused occurs." *Id*. Similarly, a circuit court's "determination of unavailability is a judicial exercise reviewable on appeal only for abuse of discretion." *De La Beckwith v. State*, 707 So. 2d 547, 586 (¶155) (Miss. 1997).

¶15. The prosecution bore the burden of proving that Dr. Li was unavailable. *Id*. A witness is unavailable to testify if he or she "[i]s absent from the hearing and the proponent of his statement has been unable to procure his attendance (or in the case of a hearsay exception under subdivision (b)(2), (3), or (4), his attendance or testimony) by process or other reasonable means[.]" M.R.E. 804(a)(5). If a witness is unavailable as contemplated by Rule 804(a), then "[t]estimony given as a witness at another hearing of the same or a different proceeding" is not excluded by the hearsay rule "if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." M.R.E. 804(b)(1).

¶16. It is undisputed that Dr. Li was out of the country during Ellis's trial. However, Ellis argues that the prosecution could have subpoenaed Dr. Li when he was in Jackson to testify in a different case to compel his attendance during Ellis's trial. Ellis further argues that "going on a trip or inconveniencing a witness" is not a sufficient basis to find that a witness is unavailable to testify.

¶17. In *Wilson v. State*, 923 So. 2d 1039, 1041 (¶¶7-8) (Miss. Ct. App. 2005), this Court

6

upheld a circuit court's decision to allow the videotaped deposition testimony of an expert witness. The circuit court had declared the witness "unavailable," observing that the case had already been postponed for two years, there was "no reasonable way to obtain [the witness's] presence in the state during [the trial,]" and "[t]he only alternative would be to postpone the trial[.]" *Id.* at (¶7). This case is strikingly similar. We do not find that the circuit court abused its discretion when it held that Dr. Li was unavailable to testify.

¶18.    It was also within the circuit court's discretion to find that Ellis was not prejudiced by the fact that Dr. Li testified by way of a video deposition. Ellis's trial attorney cross-examined Dr. Li during the deposition. For the first time on appeal, Ellis seems to argue that he suffered prejudice because, at trial, he did not have an opportunity to cross-examine Dr. Li regarding the fact that "wadcutter" pistol bullets were recovered from Ellis's apartment, and the two bullets recovered from Barry's body were "jacketed."

¶19.    As an expert witness in the field of "firearm and tool[-]mark identification," Tommy Bishop testified that the two bullets recovered from Barry's body had "class characteristics" of a .38 caliber bullet, which meant that the "projectile and gun have a diameter of .355 inches . . . ."[3] Tommy also testified that the nine-millimeter pistol recovered from Ellis's apartment could have feasibly fired the bullets that were recovered from Barry's body. However, Tommy could not positively "include or exclude [the] firearm as being used to fire those projectiles." The only significance of the "wadcutter" bullets recovered from Ellis's

---

[3] Tommy explained that cartridges included in the .38 caliber class all have the same diameter. He specifically mentioned "a .380 auto firearm, a nine-millimeter, a .38 special[,] and a .357 magnum . . . ."

apartment was that they were also within the .38 caliber class. Stated differently, Tommy's testimony supported the conclusion that Ellis's pistol could have fired the "wadcutter" bullets *and* the jacketed bullets recovered from Barry's body.

¶20.    Dr. Li testified that he recovered two bullets from Barry's body. He did not opine as to their class characteristics or the likelihood that they were fired from Ellis's pistol. Cross-examining Dr. Li regarding Tommy's testimony would not have aided Ellis. Conversely, Ellis was not prejudiced by the fact that he was not able to confront Dr. Li with Tommy's testimony. There is no merit to this issue.

## II.    Cheryl's Testimony

¶21.    In this issue, Ellis claims the circuit court erred when it allowed Cheryl to testify to the following: (1) Barry said that Ellis had been following her car; (2) Ellis threatened to kill Barry if Cheryl did not stop seeing him; and (3) she believed that Ellis was responsible when she learned that Barry had been killed. According to Barry, the circuit court should have held that each statement was inadmissible hearsay. As stated above, "[t]he admissibility of evidence rests within the discretion of the trial court." *Armstrong*, 771 So. 2d at 996 (¶36).

### A.    Present Sense Impression

¶22.    Ellis argues that Cheryl should have been prohibited from testifying that Barry once said that Ellis had been following her. Cheryl testified that as she was driving to Barry's apartment at approximately 1:00 or 2:00 a.m., she noticed that a car was following her. She did not recognize the car, so she "just drove around." Eventually, she went to Barry's apartment. Barry met her outside on his porch, where Cheryl told him that someone had been

8

following her. According to Cheryl, Barry told her "that was [Ellis]." At that time, Ellis's trial attorney objected and argued that Cheryl's testimony was inadmissible hearsay. Initially, the circuit court sustained the objection. However, the prosecution argued that Cheryl's testimony was an exception to the hearsay rule because she was testifying regarding Barry's present sense impression. The circuit court reversed its initial ruling and allowed Cheryl's testimony. On appeal, Ellis argues that the circuit court's decision results in reversible error.

¶23. "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." M.R.E. 801(c). "Hearsay is not admissible except as provided by law." M.R.E. 802. However, "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition or immediately thereafter" is "not excluded by the hearsay rule, even though the declarant is available as a witness." M.R.E. 803(1). This is because "the timing of the statement makes it unlikely that the declarant made a deliberate misrepresentation." *Lewis v. State*, 110 So. 3d 814, 819 (¶18) (Miss. Ct. App. 2013) (citing *Clark v. State*, 693 So. 2d 927, 932 (Miss. 1997)). "To be admissible under this exception, the statement must be spontaneous. The determination of spontaneity is a question for the trial judge, whose action should not be overturned unless this Court would be justified in concluding that under all and any reasonable interpretation of the facts the exclamation could not have been spontaneous." *Clark*, 693 So. 2d at 932.

¶24. In *Turner v. State*, 573 So. 2d 1335, 1338 (Miss. 1990), the Mississippi Supreme Court addressed a somewhat similar issue. In that case, Edward Turner Jr. argued that a

circuit court erred when it allowed a law-enforcement officer to testify that a confidential informant had identified Turner during a drug transaction. *Id*. The supreme court noted that "[t]he statement [the confidential informant] made described and identified the person [he] was talking to while he was perceiving and talking to this individual." *Id*. at 1338-39. Consequently, the supreme court held that the law-enforcement officer's hearsay testimony was admissible under the present-sense-impression exception to the hearsay rule. *Id*. at 1339.

¶25. Cheryl's testimony indicated that Barry identified Ellis while he was looking at him. In fact, Cheryl also suggested that Barry attempted to communicate with him. According to Cheryl, she heard Barry say, "what's up, man?" to the person who had been following her, immediately before Barry explained that it was Ellis. Cheryl also testified that Barry and Ellis had worked together in the past, so they knew each other. We find that the circuit court did not abuse its discretion when it overruled Ellis's objection to the testimony at issue.

### B. Ellis Had Threatened to Kill Barry

¶26. Next, Ellis takes issue with Cheryl's testimony that she had heard him threaten to kill Barry if she did not stop seeing Barry. Although Ellis does not cite to the record to support his argument, it appears that it is related to the following portion of Cheryl's direct testimony:

Q. Okay. Did . . . Ellis express his disdain for your relationship with . . . Barry up until [Barry's] death?

A. Yes.

Q. In what ways?

A. [Ellis] always - - he threatened with violence. He would threaten. He would always talk about killing [Barry]. ["]I better not see him. I better not see you with him,["] you know. ["]I'll kill both of y'all . . .

10

.["]

Q.     How many times over the course of a year would you say he did that?

A.     More than 75.  More than 50.

Q.     So you can't count how many times it was?

A.     No.

Q.     And when you say [Ellis] would make threats, was he making threats against the life of . . . Barry?

At that time, Ellis's trial attorney objected to the question on the basis that it was leading. The prosecutor responded by rephrasing the question, and the circuit court instructed the jury to "[d]isregard the last question and response."  Cheryl's testimony continued as follows:

Q.     You said that . . . Ellis would make threats.  What [was] the content of those threats?

A.     That he would kill him.

Q.     Did you believe him?

A.     No.

Q.     Why do you say that?

A.     Because that was just crazy.  That's just crazy.  Who talks about killing somebody?

¶27.   Ellis claims that Cheryl's testimony regarding the threats was inadmissible hearsay. However, it is clear that Ellis never objected on that basis at trial.  The supreme court has held that a contemporaneous objection is necessary to preserve an issue for appellate review; otherwise, "the error, if any, is waived."  *Slaughter v. State*, 815 So. 2d 1122, 1131 (¶47) (Miss. 2002).  Furthermore, an "[o]bjection on one ground at trial waives all other grounds

11

for objection on appeal." *Carter v. State*, 722 So. 2d 1258, 1261 (¶13) (Miss. 1998). Because Ellis did not object to the testimony at issue on the basis that it was inadmissible hearsay, he is procedurally barred from doing so for the first time on appeal.

### C.     *Cheryl Thought that Ellis Killed Barry*

¶28.    Ellis's last claim regarding Cheryl's testimony relates to her statement in response to the following question: "And when you found out that [Barry] had been murdered and police were contacting you and investigation was beginning, who[] did you believe had murdered . . . Barry?" Ellis's trial attorney interjected and said, "Object to relevancy, Your Honor. That calls for speculation on the part of the witness. It's irrelevant who she believed." The prosecution responded that it was not speculation, as it was "based on her firsthand knowledge." The circuit court overruled the objection. Cheryl went on to testify that she believed that Ellis was responsible.

¶29.    Ellis argues that Cheryl's testimony was "purely an irrelevant opinion" and that it "did not meet the standards of allowable lay witness testimony under Rule 701 [of the Mississippi Rules of Evidence] as Cheryl's opinion was based purely on speculation." Additionally, Ellis claims that Cheryl's "testimony was not relevant under [Mississippi Rule of Evidence] 403 as it was highly prejudicial and could not otherwise help the jury form its own opinion of the facts or properly weigh her previous hearsay testimony."

¶30.    At trial, Ellis claimed that the testimony at issue was speculative and irrelevant. Ellis did not argue that Cheryl's testimony was impermissible lay-witness testimony. As stated above, an "[o]bjection on one ground at trial waives all other grounds for objection on

12

appeal." *Carter*, 722 So. 2d at 1261 (¶13). Therefore, he is procedurally barred from claiming that Cheryl's testimony is inadmissible lay-witness testimony for the first time on appeal.

¶31.    Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." M.R.E. 401. Irrelevant evidence is inadmissible. M.R.E. 402. "Rule 401 is construed broadly in favor of admitting evidence with even slight probative value." *Ross v. State*, 954 So. 2d 968, 993 (¶44) (Miss. 2007).

¶32.    Cheryl testified that she believed Ellis was responsible for Barry's death when she heard that Barry had been killed. There were no follow-up questions to determine whether Cheryl's opinion had changed in the time after she heard that Barry had been killed. Based on her involvement in the events that preceded Barry's death, Cheryl's testimony tended to suggest that it was more probable that Ellis had killed Barry. However, the analysis does not end here. Rule 403 is the "ultimate filter" through which all evidence must pass. *Palmer v. State*, 939 So. 2d 792, 795 (¶10) (Miss. 2006). "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." M.R.E. 403.

¶33.    The prejudicial effect of Cheryl's testimony is the possibility that the jury would be unfairly influenced toward deferring to her subjective opinion. We note that Cheryl's testimony was limited to her initial reaction, rather than her opinion based on more

13

substantial evidence. *See Whittington v. State*, 523 So. 2d 966, 975 (Miss. 1988) (holding that an investigating officer's opinion testimony regarding his suspicions of a defendant's guilt was harmless because "[i]t was no more than an expression that his suspicion was aroused following his investigation there at the scene"). But Cheryl's testimony also helped the jury understand how the investigation focused on Ellis. In other words, Cheryl's testimony regarding her initial suspicions explained why authorities suspected that Ellis may have been responsible for Barry's death.

¶34. Additionally, the prejudicial effect of Cheryl's testimony was substantially mitigated by the circuit court's instruction that it was the jurors' "exclusive province to determine the facts in this case and to consider and weigh the evidence for that purpose." The circuit court also instructed the jury that its "verdict should be based on the evidence and not upon speculation, guesswork[,] or conjecture." We therefore find no merit to this issue.

### III. Alleged Prosecutorial Misconduct

¶35. Finally, Ellis claims the circuit court erred when it denied his motion for mistrial based on statements that the prosecution made during its closing argument. Ellis takes issue with the prosecutor's statement that the evidence demonstrated that he had a "history of threats" that the defense did not dispute. Ellis's trial attorney objected that the prosecutor's comment was "a backdoor comment that . . . Ellis didn't testify."

¶36. "[A]ttorneys are allowed a wide latitude in arguing their cases to the jury. However, prosecutors are not permitted to use tactics which are inflammatory, highly prejudicial, or reasonably calculated to unduly influence the jury." *Dora v. State*, 986 So. 2d 917, 921 (¶8)

14

(Miss. 2008). This prohibition also applies to closing arguments. As for whether an improper comment warrants a mistrial, that is a matter left to the trial court's discretion. *Id*. We will reverse a trial court's decision if it qualifies as an abuse of discretion. *Id*.

¶37. The prosecution is prohibited from implying that a defendant's failure to testify is indicative of guilt. *Id*. at 923 (¶11). Even so, "there is a difference between a comment on the defendant's failure to testify and a comment on the defendant's failure to put on a successful defense." *Id*. A comment that implies a lack of a defense "will not be construed as a reference to the defendant's failure to testify by innuendo and insinuation." *Id*. "The question is whether the prosecutor's statement can be construed as commenting upon the failure of the defendant to take the stand." *Id*. The comment at issue must be examined in its context. *Id*. at (¶12). Unless the comment is an "outright violation," an appellate court "will review the facts on a case-by-case basis." *Id*.

¶38. Viewed in its context, the prosecution was arguing that four witnesses had testified that they heard Ellis make threats toward Barry, and there had been no dispute regarding their testimony. Ellis claims that only he could have disputed their testimony. However, that claim is based on the assumption that Ellis could not have called any witnesses to testify that they had never heard him threaten anyone. Additionally, the circuit court had instructed the jury that it "must not consider the fact that [Ellis] did not testify as evidence against him, and no inference of any kind may be drawn from the fact that [he] did not testify in this case." "Juries are presumed to follow the instructions given to them by the court." *Tate v. State*, 20 So. 3d 623, 632 (¶21) (Miss. 2009). Based on the totality of the circumstances, the circuit

15

court did not abuse its discretion when it overruled Ellis's motion for a mistrial.

**¶39.  THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS IS AFFIRMED.  ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., GRIFFIS, P.J., ISHEE, CARLTON, MAXWELL, FAIR AND JAMES, JJ., CONCUR.  BARNES AND WILSON, JJ., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION.**