HOOD, Judge.
This action was instituted originally as a concursus proceeding by Scurlock Oil Company, the purchaser of condensate from a unit well in St. Landry Parish. A claim for a part of the proceeds due for condensate was made by defendant Robert L. Waterbury, and a conflicting claim for the same proceeds was made by a group of defendants referred to as the “Bauman Group.”
We held when this case was before us earlier that the Bauman Group was entitled to the proceeds which were in dispute. Scurlock Oil Company v. Getty Oil Company, 278 So.2d 851 (La.App. 3 Cir. 1973). The Supreme Court reversed, holding in effect that Waterbury was entitled to those proceeds, and that judgment is now final. The Supreme Court, however, remanded the case to the trial court solely for the purpose of terminating “all controversies over well costs and operating expenses.” 294 So.2d 810 (La.1974).
After the case was remanded pleadings were filed by the Bauman Group and by Getty Oil Company claiming reimbursement for drilling costs and operating expenses. By stipulation of interested parties, the claim of Getty was paid from the accumulated proceeds. The claim of the Bauman Group for reimbursement of well costs and operating expenses was opposed *872 by Waterbury, and after trial judgment was rendered by the district court in favor of the Bauman Group, directing that it be paid the sum of $18,725.58, with interest, from the above proceeds, and casting Waterbury for costs. Waterbury appealed. The case is before us now on that appeal.
A companion concursus proceeding was filed by Louisiana Intrastate Gas Corporation, the purchaser of gas produced from the above units, and that suit was consolidated for trial and appeal with the instant case. The same issues are presented in the companion suit as are presented here, and substantially the same judgment was rendered in that case as was rendered in this one. Waterbury appealed in both cases. We are rendering judgment in the companion suit on this date. See Louisiana Intrastate Gas Corporation v. Waterbury, 324 So.2d 880.
The following questions are presented: (1) Has R. L. Bauman, one of the claimants in the Bauman Group, forfeited his right to recover well costs and operating expenses because of his alleged failure to comply with LSA-R.S. 30:103.1 and 103.-2? (2) Does the evidence support the award made to the Bauman Group by the trial court for drilling costs and operating expenses? (3) Are parties other than R. L. Bauman, the “Unit Operator,” entitled to recover well costs?
Some of the facts pertinent to the issues presented here were set out in judgments heretofore rendered by this court and by the Supreme Court, and we refer to those judgments for a more detailed recitation of the facts. See the cases already cited, and also House v. Tidewater Oil Company, 219 So.2d 616 (La.App. 3 Cir. 1969), and Louisiana Intrastate Gas Corporation v. Waterbury, 278 So.2d 863 (La.App. 3 Cir. 1973).
On July 29, 1954, Burice C. Bihm executed a mineral lease in favor of F. J. Muller, covering a six acre tract of land in St. Landry Parish. On the next day, July 30, 1954, Adler V. LeDoux and James Pitre executed a mineral lease in favor of Muller covering an adjoining 152 acre tract in that parish. Shortly thereafter Muller assigned both of those leases to Tidewater Oil Company (now Getty Oil Company). These leases are referred to sometimes as the “Waterbury leases.”
Effective March 1, 1959, the Commissioner of Conservation created a 320-acre drilling unit, known as the “Cockfield 2 Sand Unit No. 21-2,” which included a part of the surface acreage covered by both of the above leases, as well as part of the surface of an adjacent tract owned by Robert L. Waterbury. The unit controlled production from only one sand, called the Cockfield No. 2 Sand.
Early in 1960 Tidewater drilled and completed the R. L. Waterbury Unit 21-2 well on property owned by Waterbury and located in the above unit. The well produced until August 6, I960, when it was abandoned. Waterbury, an experienced oil operator, undertook to rework the well, and he restored production from it on November 25, 1960, which was 111 days after the well had been ' abandoned. A dispute arose between Waterbury and other landowners as to whether the “Waterbury leases” had been forfeited because of the failure of the lessees, or their assignees, to commence reworking operations within 90 days of the cessation of production, as provided in those leases.
On June 5, 1961, Tidewater executed an instrument releasing from the above mentioned leases, all of the property affected' by those leases, other than the acreage included within the boundaries of the Cock-field No. 2 Sand Unit.
On June 23, 1961, Burice C. Bihm executed a mineral lease in favor of Vernon J. Main, Jr., affecting the same six acre tract which he previously had leased to Muller. And, on the same date Adler V. LeDoux and James Pitre executed a lease in favor of Main affecting the 152 acre tract they had leased to Muller. Shortly *873 thereafter, Main transferred both of those leases to the “Bauman Group”. All parties concede that the Bauman leases were “top leases,” and that they would become effective only if and when the Waterbury leases were cancelled or terminated. There, of course, was a serious controversy at the time those leases were executed as to whether the Waterbury leases had been terminated by the lessee’s failure to conduct reworking operations timely. The Bauman Group took the position that the Waterbury leases had been forfeited, and that the later Bauman leases thus were the only valid leases affecting the property in dispute.
After the Bauman Group acquired the above mentioned “top leases,” they drilled a well on a part of the 152 acre tract which was included in the above unit. That well, known as the “Adler V. Le-Doux No. 1 Well,” was completed in November, 1961, and condensate and gas have been produced from that well since that time.
On November 20, 1961, Tidewater transferred the “Waterbury leases,” which it had acquired from Muller, to Aladdin Oil Company, Inc., and shortly thereafter Aladdin transferred both of those leases to defendant Waterbury, insofar as they covered property in the 320-acre unit, and insofar as those leases affected the Cockfield No. 2 Sand.
On September 6, 1962, the lessors in the Waterbury leases sued Tidewater, Waterbury and Aladdin, to cancel the leases which Waterbury acquired from Tidewater on the ground that reworking operations had not been started within 90 days after the wells ceased to produce on August 6, 1960. That case was not decided finally until several years later. While it was pending a serious question existed as to whether the Bauman Group or Waterbury had valid leases affecting the land on which the well was drilled.
The Louisiana Department of Conservation, after having created “Cockfield 2 Sand Unit No. 21-2,” effective March 1, 1959, issued the following additional orders relating to drilling and production units affecting the property in dispute here:
(1) Order No. 257-A-4, effective January 1, 1962, dissolving Unit 21-2 and creating Cockfield 2 Sand Unit 23-2, specifying that the Adler V. LeDoux Well No. 1 is the unit well, and appointing R. L. Bauman as operator of Unit 23-2. This unit was dissolved effective January 1, 1963.
(2) Order No. 257-A-7, dissolving Unit 23-2 effective January 1, 1963, and creating instead, effective the same date, Cockfield 2 Sand Unit “W,” and designating R. L. Bauman as operator of the unit. That unit was dissolved effective as of March 1, 1966.
(3) Orders 257-A-15 and 257-A-16, dissolving the unit created by the last mentioned order, effective March 1, 1966, creating instead Cockfield 2 (Reservoir “A”) Fieldwide Unit, effective the same date, and designating Getty Oil Company as operator of the unit. This unit is still in effect.
On October 12, 1962, while the above suit was pending, Robert L. Waterbury wrote to R. L. Bauman, the unit operator named in two of the above orders and one of the claimants in the Bauman Group, as follows:
“I am an interest owner of record in the above captioned unit more completely described as Louisiana Department of Conservation order number 257-A-4, as amended by letter dated January 8, 1962, signed by Honorable James H. Gill, Commissioner. You have been designated Operator of the unit so created, effective January 1, 1962.
“It has come to my attention that you are producing gas and/or condensate *874 from this unit well, and I assume that you have negotiated a Gas Sales Agreement with a gas purchaser as to your pro-rata of the gas you are producing and selling.
“To date, you have not filed a plat of survey of this unit with the Louisiana Department of Conservation as directed by the above stated order.
“To date, you have not rendered me an accounting with regard to my interest.
“In view of the above I herewith make formal demand, in accordance with the laws of the State of Louisiana, with particular reference to Title 30 of the Revised Statutes, as amended, for an itemized, detailed accounting of all funds expended on the drilling, completing, and operating of the subject well, together with a statement showing all production from the initial date thereof to the present time.”
That letter was sent by registered mail. Bauman has never responded to it, and he did not submit a sworn, detailed, itemized statement of the costs of drilling operations on the unit well until several years later, as hereinafter shown.
The above.suit attacking the validity of the Waterbury leases was tried in the district court, and the trial judge found that Waterbury had begun reworking operations timely. Judgment thus was rendered by the trial court decreeing that the “Waterbury leases,” that is the oil, gas and mineral leases which Waterbury acquired from Tidewater, were still in effect and were valid. We affirmed that judgment on January 29, 1969. 219 So.2d 616 (La.App. 3 Cir. 1969).
The present concursus suit was instituted on September 4, 1970. An answer was filed by the Bauman Group on October IS, 1971, alleging primarily that the leases held by that group of defendants were valid, and that the Waterbury leases had been terminated by cancellation executed by Tidewater Oil Company. The Bauman Group also prayed specifically for reimbursement, out of the funds on deposit, of the costs they incurred in drilling, testing, completing and equipping the LeDoux No. 1 Well, and the expenses they incurred in operating the unit from January 1, 1962, until March 1, 1966. Getty Oil Company also filed an answer in the concursus proceeding on October 15, 1971, claiming operating expenses from March 1, 1966, until August 31, 1971, and the expenses which would be incurred after the last mentioned date.
The district court decided the issues relating to the validity of the “Waterbury leases,” and as already noted, the Supreme Court ultimately decided that those leases were still in effect and that defendant Waterbury had valid leases affecting the property in dispute. Pursuant to a stipulation of the parties, however, the Supreme Court pretermitted a decision as to the well costs and operating expenses, and it ordered that no distribution of the funds held in the registry of the court would be made until all controversies over well costs and operating expenses were terminated. The Supreme Court then remanded the case to the trial court for that purpose. A rehearing was denied by that court on June 7, 1974.
On July 12, 1974, or 35 days after that judgment of the Supreme Court became final, defendant Waterbury filed a motion in this proceeding praying “for an order setting a time limit within which claims for well cost can be filed by parties to these proceedings.” Pursuant to that motion by Waterbury, the following order was issued by the trial court on the day the motion was filed:
“IT IS HEREBY ORDERED that all parties to these proceedings claiming that they are entitled to recover well costs from any other party to these proceedings out of the fund on deposit herein or otherwise shall file pleadings set *875 ting forth the amount of well costs claimed, the party against whom such claim is asserted, and the basis for such claim, whether such claims for well costs pertain to unpaid well costs or to well costs that have been wrongfully paid or deducted from the fund on deposit herein, on or before the 3rd day of September, 1974, in default of which such claims for well costs will be forfeited.”
In compliance with that order, the Bau-man Group timely filed pleadings setting forth the amount of well costs claimed, the fund from which those costs were to be paid, and the basis for Such claim. Waterbury filed exceptions of vagueness, and a formal “Motion to Set Exceptions for Hearing.” In response to the last motion, the trial judge issued an order on September 11, 1974, fixing the exceptions for hearing on September 20, 1974. On the last mentioned date, stipulations were entered into by all interested parties before the trial judge that $58,000.00 would be retained in the registry of the court to take care of any drilling or operating expenses which may be due. The parties, including Water bury, also stipulated that:
“It is stipulated by and between counsel that the Bauman et al group will file detailed schedules of well costs and operating expenses on or before November 4, 1974 at 10:00 o’clock A.M. or thereafter be precluded from asserting any claims therefor.”
Despite the above quoted stipulation, Waterbury filed a supplemental answer on November 1, 1974, in which he denied the claim of the Bauman Group, and specially pleaded for the first time that R. L. Bau-man, and every other claimant included in the Bauman Group, had forfeited their right to claim drilling costs because of their' failure to comply with LSA-R.S. 30:103.1 and 103.2.
The Bauman Group then filed a “Motion to Withdraw Funds,” and pursuant to that motion a rule was issued directing any interested parties to show cause why an order should not be issued authorizing that group of defendants to withdraw from the funds on deposit the amount claimed by the movers, with interest. That motion was tried, and following that trial judgment was rendered by the trial court in favor of the Bauman Group, awarding them the amount which they sought.
The principal issue presented on this appeal is whether R. L. Bauman, one of the defendants included in the Bauman Group, has forfeited his right to claim drilling costs. We have decided that his right to recover those costs has not been forfeited.
LSA-R.S. 30:103.1 and 103.2 provide:
§ 103.1 “Whenever there is included within a drilling unit, as authorized by the commissioner of conservation, lands producing oil or gas, or both, upon which the operator or producer has no valid oil, gas or mineral lease, said operator or producer shall report to the owners of said interests, by a sworn, detailed, itemized statement, the costs of the drilling operations of said unit within ninety calendar days from the completion of the well. Reports shall be sent by registered mail to each owner of an unleased oil or gas interest who has requested such report and furnished his name and address to the operator or producer.”
§ 103.2 “Whenever the operator or producer permits (1) ninety calendar days to elapse from completion of the well and (2) fifteen additional calendar days to elapse from date of receipt of written notice by registered mail from the owner or owners of unleased oil and gas interests calling attention to failure to comply with the provisions of R.S. 30:103.1, such operator or producer shall forfeit his right to demand contribution from the owner or owners of the un-leased oil and gas interests for the costs of the drilling operations of the well.”
*876 Waterbury argues that since R. L. Bau-man, the operator of Unit 23-2 and Unit “W,” failed to file a sworn, detailed, itemized statement of the costs of drilling the unit well, the LeDoux No. 1 Well, within 90 days after completion of that well, or within 15 days after receipt of the written notice which was sent by Waterbury to R. L. Bauman on October 12, 1962, Bauman has forfeited his right to demand contribution from Waterbury of a proportionate part of the drilling costs.
It is significant, we think, that at the time the above letter was sent, a suit was pending against Waterbury and others attacking the validity of the leases which Waterbury claimed to own affecting parts of the property included in the units.. The plaintiffs in that suit included Bihm, Le-Doux and Pitre, the lessors in both the “Waterbury" leases” and in the “Bauman leases.” Although the Bauman Group were not plaintiffs, they had a direct interest in the outcome of that suit because the judgment rendered in it would determine whether Waterbury had valid leases on a part of the property included in the above units, or whether the Baumans had valid leases on that property. If the Waterbury leases were found to have been terminated and the Bauman top leases to be effective and valid, then R. L. Bauman, the operator, would not be required by the above sections of the Revised Statutes to file a statement of drilling costs as to the owners of that property.
We held in White v. Phillips Petroleum Company, 232 So.2d 83 (La.App. 3 Cir. 1970), that LSA-R.S. 30:103.2 is a penal statute, and that it thus must be strictly construed. See also Genmar Oil & Gas, Inc. v. Storm, 297 So.2d 722 (La.App. 4 Cir. 1974; writ granted, La., 302 So.2d 13; action dismissed, La., 309 So.2d 657).
In White, supra, we refused to apply the penal provisions of that statute, because the written notice which plaintiff sent by registered mail to defendant did not clearly show that plaintiff was requesting a statement of costs, and that it did not point out to the operator that it had failed to comply with the above section of the Revised Statutes.
In Genmar, supra, our brothers of the Fourth Circuit Court of Appeal refused to apply the penal provisions of LSA-R.S. 30:103.1 and 103.2, although a proper notice was sent and the operator failed to submit a statement of drilling costs within 90 days after the drilling was completed, or within 15 days after that notice was sent, because the well was drilled before the property was unitized, and the required information was furnished within 90 days after the unitization order was issued. The court said in that case that LSA-R.S. 30:103.1 “creates a hardship on those persons who drill on leased property that is not within a unit at the time of completion of a well,” and that:
“Article 21 of the Louisiana Civil Code gives the Court, in the absence of express law, authority to proceed and decide according to equity. To decide equitably, an appeal is to be made to natural law and reason, or received usages, where positive law is silent. The legislature has made no express law to cover the issue we have at hand.”
The purpose of LSA-R.S. 30:103.1 and 103.2 obviously was to provide a procedure by which the owner of unleased lands in a drilling or production unit could have the amount of drilling costs fixed, so that the remaining proceeds of the sale of production could be released and he could obtain his proportionate part of those proceeds without too great a delay. That purpose would not have been served in this case by requiring R. L. Bauman to file a statement of drilling costs within 15 days after the October 12, 1962, notice was sent, because the proceeds of the sale of oil and gas from the unit well would have been retained in the registry of the court, despite the filing of such a statement, until the validity of the Waterbury leases was determined.
*877 We do not believe that the Legislature intended for LSA-R.S. 30:103.1 and 103.2 .to be applied under the circumstances presented here, where its application would serve no useful purpose. In view of that conclusion, and our feeling that the statutes are penal and should be construed strictly against the party seeking to impose the penalty, we conclude that LSA-R.S. 30:103.1 and 103.2 were not applicable while the suit contesting the validity of the Waterbury leases was pending.
We also feel that Waterbury has waived his right to enforce the penalty provided in those sections of the Revised Statutes. As already noted, shortly after the Supreme Court remanded the case to the trial court, an order was issued by the trial court specifying a time limit within which “claims for well costs can be filed by parties to these proceedings.” That order was issued in response to a motion filed by Waterbury seeking such a decree, and the Bauman Group filed their claim within the time specified in the order. Waterbury also entered into a stipulation with other interested parties, before the trial judge, that “the Bauman et al group” could file detailed schedules of well costs and operating expenses “on or before November 4, 1974.” Those schedules were filed by the Bau-mans within the time set out in that stipulation.
After Waterbury sought and obtained the above order and entered into a stipulation specifically permitting the Bauman Group to file claims for well costs and operating expenses, he then filed an amended answer in which he took a totally inconsistent position. He alleged in that pleading, and he contends now, that R. L. Bau-man, and all other members of the Bauman Group, forfeited their right to claim well costs in 1962, long before he stipulated that they now could file such a claim. He also argues on this appeal, inconsistent with his previous actions, that all members of the Bauman Group, other than R. L. Bauman, are precluded from claiming well costs, primarily because they were not designated as operators of either of the units involved here.
We believe that Waterbury, by seeking and obtaining the above court order, and by stipulating that the Bauman Group could file a claim for well costs and operating expenses within a specified time, waived any right he may have had previously to enforce the penalty provided in LSA-R.S. 30:103.1 and 103.2.
Our conclusion is that R. L. Bau-man has not forfeited his right to recover well costs and operating expenses. Waterbury did not send a notice to any other claimant included in the Bauman Group, so the above statutes are not applicable to the claims being asserted by them.
We turn now to the question of whether the evidence supports the conclusions reached by the trial court as to the amount of well costs and operating expenses which were incurred.
The Bauman Group did not introduce in evidence the statement of costs and expenses which they previously had filed in the record pursuant to court orders authorizing them to do so, and they offered no evidence at the trial as to the amount of the well costs and operating expenses they incurred. Waterbury testified in his own behalf, and his testimony constituted the only evidence which was offered at the trial. He testified that he made several demands on R. L. Bauman for a statement of the well costs prior to October 12, 1962, but that no such statement was furnished to him. He said nothing, however, about the well costs or operating expenses which may have been incurred by the Bauman Group, and there is nothing in his testimony which in any way tends to question or contradict the statement of such costs or expenses which was furnished by the Bau-man Group.
Waterbury argues that we cannot consider the sworn statement of costs and ex *878 penses which is in the record, because it was not formally introduced in evidence. The only authorities cited to support that argument are four cases which hold that plaintiff bears the burden of proving his case by a preponderance of the evidence. Counsel states in a brief filed on this appeal that “it is incredible that the plaintiff was able to obtain a judgment without offering any evidence at all.” We have decided that the above statement can be considered, and that it constitutes prima facie proof of the facts set out in it.
The statement or schedule at issue here is a detailed, itemized statement of the well costs and operating expenses incurred by the Baumans. It was prepared by Louis D. Gibbons, a public accountant, and attached to it is an affidavit of the accountant to the effect that he prepared the statement, and that it reflects the direct costs of leasing, drilling, and equipping the unit well, the costs of operating said well through April, 1962, and the operating expenses incurred by the Bauman Group from May, 1962, through March, 1966.
The verified statement was filed in the record on November 13, 1974, pursuant to a stipulation entered into by all parties, including Waterbury, on September 20, 1974, and pursuant to three separate court orders specifically ordering or authorizing the filing of such a statement. The court orders were issued on July 12, November 4 and November 13, 1974, respectively.
Prior to the filing of the certified statement, the Bauman Group filed pleadings setting out the amount of their claim and an unverified schedule of well costs and operating expenses. The verified statement was attached to and made a part of a “Motion to Substitute Verified Statement of Louis D. Gibbons,” which was filed by the Bauman Group on November 13, 1974. The movers alleged in that pleading that they are entitled to be reimbursed $18,725.-58, as the proportionate share of the disputed acreage of the well costs and operating expenses. A court order was signed in response to that motion on November 13, authorizing the verified schedule to be substituted in lieu of the statement previously filed in the record.
On May 28, 1975, upon motion of the Bauman Group, a rule was issued directing any interested party to show cause why an order should not be issued authorizing the Bauman Group to withdraw $18,725.58, with interest, from funds on deposit, as shown on the above mentioned verified statement.
Waterbury filed no pleadings opposing the verified statement after it was filed or after the above rule was issued on May 28, 1975. And, as already noted, he did not question the figures set out in that statement at the trial. Nothing, in fact, was said by anyone who participated in the trial about the. amount being claimed by the Baumans as reimbursement of drilling costs and operating expenses. The question thus was not presented to the trial court as to whether the verified statement could be considered.
In Burckett v. Hopson, 19 La.Ann. 489 (1867), a question was presented as to whether answers of a- party interrogated on facts and articles could be considered, although not introduced in evidence. Our Supreme Court in holding that the answers could be considered, said:
“ . . . The answers of a party interrogated on facts and articles form a part of the pleadings, and make a part of the record, and either party may use them without formally introducing them in evidence.”
The First Circuit Court of Appeal noted in Greer v. Sumney, 41 So.2d 526 (La.App. 1 Cir. 1949), that a survey which had been offered in evidence and then withdrawn could be considered. The court said :
“It is annexed to plaintiff’s petition and made a part thereof and is therefore *879 a part of the record without the necessity of being specially offered.”
In the instant suit we conclude that the verified statement submitted by the Bauman Group constituted a part of the record, and that it could and should be considered by the court in resolving the issues presented here, even though it was not formally introduced in evidence at the trial. See also Powell & Hopkins v. Hopson, 14 La.Ann. 666 (1859).
The burden of proof rests on plaintiff-in-rule, the Bauman Group, to establish the amounts they are entitled to withdraw from the fund on deposit. LSA-C.C.P. art. 963; McMahon, Summary Procedures : A Comparative Study, 31 Tul.L.Rev. 573, 586, n. 50 (1957).
In the instant suit, we think the verified statement submitted by the Bauman Group constituted prima facie proof of the well costs and operating expenses incurred by that group. Since Waterbury has not opposed or contradicted the figures shown in that statement, we find that the statement must be accepted as proof of the facts therein set out, and that it constitutes adequate evidence to support the judgment of the trial court.
Finally, Waterbury contends that reimbursement of well costs is limited solely to R. L. Bauman, the unit operator, and that the other members of the Bauman Group are not entitled to recover from him or from his part of the proceeds of the production. His argument is that he had no contract with any of those parties and no evidence was offered to indicate that they were subrogated to the rights of anyone who had a claim against Waterbury. In the absence of a contractual agreement, or proof of subrogation to the unit operator’s rights, he argues, parties other than the unit operator have no right to recover from Waterbury.
We find no merit to that argument. Since there is nothing in the record tending to show that any of the Baumans were in bad faith in drilling the LeDoux No. 1 Well, we conclude that they were in good faith. They incurred drilling costs and operating expenses, and Waterbury has enjoyed the profits resulting from their efforts and expenditures, without participating in the costs or expenses incurred by them.
Article 21 of the Louisiana Civil Code provides that in civil matters, where there is no express law, the judge is bound to proceed and decide according to equity. That article was applied by our Supreme Court in Huckabay v. Texas Company, 227 La. 191, 78 So.2d 829 (1955), a case similar to the instant suit, where the court said:
“ . . .on several occasions this Court has applied the equitable rule that where one co-owner (or co-lessee) has explored and developed a field without the concurrence or assistance of the other, the former is bound to account to that other for his proportionate share of the proceeds less a proportionate share of the expenses. Martel v. Jennings-Heywood Oil Syndicate, 114 La. 351, 38 So. 253; Allies Oil Co. v. Ayers, 152 La. 19, 92 So. 720; Connette v. Wright, 154 La. 1081, 98 So. 674. While the right of an owner to refrain from exercising his right of ownership, if so minded, is absolute, LSA-Civil Code, Articles 491, 496, he nevertheless may not enjoy the profits without participating in the expenses incurred in producing those profits, since to permit him to do so would violate the moral maxim of the law that no one ought to enrich himself at the expense of another.”
We hold that the members of the Bauman Group who incurred well costs and operating expenses in connection with the well and the units involved here are entitled to reimbursement, even though some of them were not designated as operators of the units.
*880 Our ultimate conclusion is that the judgment rendered by the trial court is correct, and that it should be affirmed.
For the reasons assigned, the judgment appealed from is affirmed. , The costs of this appeal are assessed to defendant, Robert L. Waterbury.
Affirmed.