# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-30450

United States Court of Appeals
Fifth Circuit

**FILED**
May 12, 2017

Lyle W. Cayce
Clerk

T D X ENERGY, L.L.C.,

　　　　Plaintiff - Appellant Cross-Appellee

v.

CHESAPEAKE OPERATING, INCORPORATED,

　　　　Defendant - Appellee Cross-Appellant

———————————

Appeals from the United States District Court
for the Western District of Louisiana

———————————

Before PRADO, HIGGINSON, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:

Captain Anthony F. Lucas struck oil in the Spindletop salt dome in Texas in 1901. A black oil plume erupted to twice the height of the drilling derrick, and the well produced a record 800,000 barrels of oil within nine days. Others rushed to seize a share of the abundance. Wells were "drilled as close together as physically possible"; "on occasion four wells were drilled beneath one derrick

floor."[1]   In short order, there were 440 wells on Spindletop's 125-acre hill. Another 600 were drilled around the hill.[2]   This is how it looked:[3]



Within a few years, most of the wells were dry.   As Captain Lucas remarked, the oil was "milked too hard" and "not milked intelligently."[4]

---

[1] Rance L. Craft, *Of Reservoir Hogs and Pelt Fiction: Defending the* Ferae Naturae *Analogy Between Petroleum and Wildlife*, 44 EMORY L.J. 697, 701 & n.22 (1995) (quoting Walter Rundell, Jr., EARLY TEXAS OIL: A PHOTOGRAPHIC HISTORY 1866-1936, at 38 (1977)).

[2] *Id.* at 701.

[3] Edgerton, *Boiler Avenue*, 1903, *in* Rundell, *supra* note 1, at 43.

[4] Craft, *supra*, at 701 (quoting Richard O'Connor, THE OIL BARONS: MEN OF GREED AND GRANDEUR 85 (1971)).

No. 16-30450

To prevent this "tragedy of the commons," states have enacted regulations in the years since Spindletop. Louisiana's "forced pooling" regime is the subject of this case. It allows the government to authorize a single operator to drill for oil and gas even when all parties possessing oil and gas interests in the drilling area have not agreed to go forward. The Louisiana statutory scheme thus has to address a number of issues that contracts usually decide, such as how to allocate costs and risk among those holding interests in the oil and gas. We are presented with questions of statutory interpretation about this scheme's disclosure and risk-fee provisions.

## I.

Although Spindletop is an extreme example, similar wasteful overproduction was once common. A cause was the "rule of capture," the common law doctrine initially used in hunting disputes to determine ownership of wild animals unconstrained by property borders. Rance L. Craft, *Of Reservoir Hogs and Pelt Fiction: Defending the Ferae Naturae Analogy Between Petroleum and Wildlife*, 44 EMORY L.J. 697, 708–09 (1995). Taught during the first days of law school, the doctrine says if you catch it first, it is yours. *See Pierson v. Post*, 3 Cai. 175 (N.Y. Sup. Ct. 1805). Courts later applied the doctrine to oil and natural gas, reasoning that they too cross property borders as they seep and spill through crevices underground. *See Brown v. Spilman*, 155 U.S. 665, 669–70 (1895). In that context, the rule means a landowner has a property right in oil and gas produced from wells on the owner's land, whether or not it migrated from other lands. *Id.* at 670 ("If an adjoining owner drills his own land, and taps a deposit of oil or gas, extending under his neighbor's field, so that it comes into his well, it becomes his property."); Robert E. Hardwicke, *The Rule of Capture and Its Implications As Applied to Oil and Gas*, 13 TEXAS L. REV. 391, 393 (1935). So, under the common law, one landowner could drain an entire reservoir through wells on

the landowner's property, even if the reservoir extended under others' lands. Naturally, surrounding owners usually would not sit idly by while valuable resources drained out from under them; instead, they raced to produce all the oil and gas they could through their own property, often drilling multiple wells to extract resources as quickly as possible. Frank Sylvester & Robert W. Malmsheimer, *Oil and Gas Spacing and Forced Pooling Requirements*, 40 U. DAYTON L. REV. 47, 49 (2015). At Spindletop and elsewhere, this drove up production costs, reduced oil and gas market prices, and unnecessarily decimated the environment. *Id.*

States intervened, creating often complex regimes to regulate drilling. First, they created spacing laws, which prevent wells from being drilled too close together. *Id.* at 47–48. Then, to protect landowners who, as a result of spacing laws, were no longer able to drill on smaller tracts of land, they created pooling laws, which allow owners of adjacent tracts to combine their interests to form drilling units that meet spacing requirements. *Id.* Many states also have "forced pooling laws," which force unwilling owners to be part of a drilling unit in order to protect their neighbors' rights to benefit from their mineral rights and to promote states' interests in preventing waste and promoting economic activity. *Id.* at 48.

Louisiana is one such state. Its Commissioner of Conservation designates drilling units whenever necessary to prevent waste or avoid needless drilling, even if owners of oil and gas interests have not agreed to pool their interests. LA. R.S. §§ 30:9(B), 30:10(A)(1).[5] Once a unit has been established, the Commissioner may appoint an operator to extract oil and gas

---

[5] As discussed later, portions of the title governing mineral law in Louisiana (Title 30), have been amended since this case was filed. The version of the statute in effect from August 15, 2008, to July 31, 2012, applies to this dispute.

from a reservoir.[6] *Hunt Oil Co. v. Batchelor*, 644 So. 2d 191, 196 (La. 1994). The operator is responsible for drilling within the unit but pays a proportionate share of production to owners of oil and gas interests for any acreage on which the operator does not have an oil and gas lease.[7] LA. R.S. § 30:10(A)(1)(b); *Amoco Prod. Co. v. Thompson*, 516 So. 2d 376, 392 (La. App. 1 Cir. 1987). If those other owners have leased their mineral interests to another party, operators often pay the lessee in kind and the lessee markets and sells the oil or gas, then pays its lessor royalties; if not, the operator often sells production and makes a cash payment to the owner. *King v. Strohe*, 673 So. 2d 1329, 1338–39 (La. App. 3 Cir. 1996); *see also* LA. R.S. § 30:10(A)(3).

As a corollary to this scheme for sharing the benefits of unit production in the absence of a contract, Louisiana law contains mechanisms for sharing drilling risks and costs. *See* Sylvester & Malmsheimer, *supra*, at 62–67. Each oil and gas interest owner is responsible for a share of development and operation costs. LA. R.S. § 30:10(A)(2). To prevent free riding, the statute creates a mechanism for sharing the risk that a well, once drilled, will not produce enough to cover drilling costs. *Id.* The operator gives notice to oil and gas interest owners regarding the drilling of a well, allowing owners to elect to participate in the risk by contributing to drilling costs up front. *Id.* § 30:10(A)(2)(a)(i). If an owner does not participate, and the well produces, the operator can recover out of production the nonparticipating owner's share of expenditures along with a risk charge of two hundred percent of the owner's

---

[6] This is "an underground reservoir containing a common accumulation of crude petroleum oil or natural gas or both." LA. R.S. § 30:3(6).

[7] An "owner" under Louisiana Revised Statutes Title 30 is a "person . . . who has or had the right to drill into and to produce from a pool and to appropriate the production either for himself or for others." LA. R.S. § 30:3(8). A lessee of oil and gas rights falls within this definition.

No. 16-30450

expenditure share. LA. R.S. § 30:10(A)(2)(b)(i); *see also* Keith Hall, *Louisiana Oil and Gas Update*, 19 TEX. WESLEYAN L. REV. 361, 365–66 (2013).

The law also requires operators to share information about the costs and production other owners share under this scheme. Section 103.1 of Title 30 creates an obligation for operators to issue upon request reports containing sworn statements about drilling and operating costs, amount of production, and the price received for any sale of production. LA. R.S. § 30:103.1. Section 103.2 provides that when an operator does not provide this information within ninety days of completing a well and thirty additional days of receiving notice of its failure to comply with section 103.1, it cannot collect drilling costs. LA. R.S. § 30:103.2.

## II.

As part of this forced pooling regime, the Commissioner of Conservation created an approximately 640-acre drilling unit called "HA RA SUH" in DeSoto Parish. Chesapeake, which held a number of oil and gas leases in this unit, was named the operator. The unit well was "spud" (drilling commenced) on February 5, 2011, and was completed on July 19, 2011. When the well was spud, the oil and gas rights for approximately 63 acres in the unit had not been leased to Chesapeake or any other party (that is, the land owners still held their mineral interests). Touchstone Energy LLC acquired those rights through leases dated before drilling was completed (July 15) but not recorded until after drilling ended (between July 22 and September 14). Touchstone later transferred these leases to TDX with an effective date retroactive to the September 14th date of the final recording.

In late 2011, TDX notified Chesapeake of its interests and requested an accounting in accordance with section 103.1. About six weeks later, TDX followed up, telling Chesapeake that it was failing to comply with the statute. Chesapeake did not provide reports. Instead it sent TDX a letter asking TDX

6

to make an election whether to participate in the well's risk under section 10(A). TDX responded that the notice was untimely, so TDX was not required to make an election, and Chesapeake could not collect a risk charge. Finally, TDX wrote Chesapeake that by not providing the cost and production data, Chesapeake had forfeited its right to contribution for drilling costs.

TDX filed suit seeking its share of revenues from the unit well without deduction of drilling costs because Chesapeake did not provide the requested reports. It also sought an order directing Chesapeake to provide the reports. In addition to disputing these claims, Chesapeake filed a counterclaim seeking a declaration that it was entitled to recover TDX's share of costs incurred in drilling, testing, completing, equipping, and operating the well, plus a risk charge of two hundred percent of TDX's share because TDX did not elect to pay a risk fee.

On competing motions for summary judgment, the district court held: (1) section 103.2 was inapplicable because TDX was leasing the oil and gas interests, so Chesapeake's failure to provide the reports did not excuse TDX from paying its share of drilling costs; and (2) section 10(A) did not allow Chesapeake to collect a risk charge because it had not provided TDX timely notice that it was drilling the unit well. Each party appeals the adverse portion of the judgment. We review these questions of statutory interpretation *de novo*. *Woodfield v. Bowman*, 193 F.3d 354, 358 (5th Cir. 1999).

### III.

### A.

TDX claims that Chesapeake cannot deduct drilling costs because Chesapeake forfeited that right under section 103.2. That provision states that:

> Whenever the operator or producer permits ninety calendar
> days to elapse from completion of the well and thirty additional

calendar days to elapse from date of receipt of written notice by certified mail from the owner or owners of *unleased oil and gas interests* calling attention to failure to comply with the provisions of R.S. 30:103.1, such operator or producer shall forfeit his right to demand contribution from the owner or owners of the *unleased oil and gas interests* for the costs of the drilling operations of the well.

LA. R.S. 30:103.2 (emphasis added).

Section 103.1 provides that:

Whenever there is included within a drilling unit . . . lands producing oil or gas, or both, *upon which the operator or producer has no valid oil, gas, or mineral lease*, said operator or producer shall issue . . . reports to the owners of *said interests . . .*

LA. R.S. 30:103.1(A) (emphasis added).

The oil and gas interests at issue were leased (to TDX), but not to the operator (Chesapeake). The question, then, is whether "owners of unleased oil and gas interests" in section 103.2 includes lessees. The district court held that it does not.

Because the Supreme Court of Louisiana has not addressed the question, we must attempt to determine how that court would resolve it. *Howe ex rel. Howe v. Scottsdale Ins.*, 204 F.3d 624, 627 (5th Cir. 2000). We look to decisions of intermediate appellate state courts as "the strongest indicator of what a state supreme court would do." *Hux v. S. Methodist Univ.*, 819 F.3d 776, 780–81 (5th Cir. 2016); s*ee also Adams v. Chesapeake Operating, Inc.*, 561 F. App'x 322, 324 (5th Cir. 2014).

The only appellate court in Louisiana to address whether sections 103.1 and 103.2 give rights just to owners of wholly unleased interests or owners of interests not leased to the operator followed the latter, more expansive view. That court found that an operator breached section 103.1 by failing to provide adequate reports to a lessee of oil and gas interests not leased *to the operator*, and that the lessee was thus entitled to a forfeiture under section 103.2. *XXI*

*Oil & Gas, LLC v. Hilcorp Energy Co.*, 206 So. 3d. 885, 888 (La. App. 3 Cir. 2016) (describing previous writ denial and holding in *XXI Oil & Gas, LLC v. Hilcorp Energy Co.*, 124 So. 3d 530 (La. App. 3 Cir. 2013)).  Although the opinion is short on analysis, and relies in part on the law of the case doctrine, its holding was necessary to the outcome: a lessee was entitled to rely on section 103.2.  After reviewing and finding unpersuasive the district court's decision in this case, the Louisiana Court of Appeals "maintain[ed its] position" that a "mineral lessee of those portions not leased by the operator or producer of the well has a claim to demand an accounting" under section 103.1.  *Id.* Other published appellate court decisions, which do not directly consider the issue, also assume lessees may invoke section 103.2.  *See Scurlock Oil Co. v. Getty Oil Co.*, 324 So. 2d 870, 876 (La. App. 3 Cir. 1975); *Genmar Oil & Gas, Inc. v. Storm*, 297 So. 2d 722, 724 (La. App. 4 Cir. 1974).[8]

We defer to this view of intermediate Louisiana courts "unless convinced by other persuasive data that the highest court of the state would decide otherwise."  *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010) (quoting *Travelers Cas. & Sur. Co. v. Ernst & Young LLP*, 542 F.3d 475, 483 (5th Cir. 2008)).  We have not seen that authority.  The parties have cited to treatises that offer differing answers to the question.  *Compare* 1 Bruce M. Kramer & Patrick H. Martin, THE LAW OF POOLING AND UNITIZATION § 14.04 (3d ed. 2016) (stating that section 103.2 "appears expressly to apply only to

---

[8] Chesapeake points to an earlier writ denial by the same court that decided *XXI Oil & Gas*: *Kash Oil & Gas, Inc. v. Tex. Petroleum Inv. Co.*, No. CW 10-00079 (La. App. 3 Cir. Apr. 22, 2010).  The trial court had denied the defendant's objection of no right of action (arguing a lessee is not an owner of an unleased interest under 103.2) but granted the defendant's objection of no cause of action (arguing that applying 103.2 to a lessee is unconstitutional because 103.1's title refers only to owners of unleased oil and gas interests).  The appellate court found "no irreparable injury in the trial court's ruling."  *Id.*  We do not rely on this writ denial, which has no precedential value.  *See State v. Romero*, 552 So. 2d 45, 49 (La. App. 3 Cir. 1989).

unleased interests, not to a non-operator working interest owner"); *with* Philip N. Asprodites, *Conservation Practice, in* LOUISIANA MINERAL LAW TREATISE 527, 546 (Patrick H. Martin ed., 2012) ("[A]ny nonoperating working interest owner or unleased owner must be provided with an itemized statement of the well costs, expenses and unit production . . . .    Failure to provide the . . . information within ninety (90) days from completion of the well and after an additional thirty (30) days from receipt of a certified letter from the mineral interest owner requesting compliance with R.S. 30:103.2 will result in the operator forfeiting its right to recoup the cost of drilling the unit well allocated to said owner.").    We held off ruling on this case while a writ of certiorari was pending in *XXI Oil & Gas*.    *See* 2017 WL 1207915 (La. Mar. 24, 2017).    The denial of that writ is given no weight, *Ehrlicher v. State Farm Ins.*, 171 F.3d 212, 214 n.1 (5th Cir. 1999), but leaves the intermediate court's decision as the most probative evidence of Louisiana law.

We also find *XXI Oil & Gas*'s conclusion persuasive.    The district court believed that the plain language of section 103.2—"owners of unleased oil and gas interests"—is clear: unleased interests are interests that are not leased. *TDX Energy, LLC v. Chesapeake Operating, Inc.*, 2016 WL 1179206, at *5–6 (W.D. La. Mar. 24, 2016).    But sections 103.1 and 103.2 must be read together. *Adams v. Chesapeake Operating, Inc.*, 2013 WL 1193716, at *4 (W.D. La. Mar. 21, 2013) (rejecting construction of 103.1 where "[o]nly a purely literal application of each sentence of the statute, in isolation and without regard to context or the other provisions of the statute" supported it), *aff'd*, 561 F. App'x 322; *see also* LA. CIV. CODE. art. 13 (mandating that laws on the same subject matter be interpreted in reference to each other).    Sections 103.1 and 103.2

were added to Title 30 by the same legislative act,[9] and section 103.2 refers to section 103.1, which creates the obligation that section 103.2 enforces. *See* LA. R.S. § 30:103.2. When, as punishment for failure to comply with section 103.1, section 103.2 absolves owners from paying drilling costs, it thus refers to the same owners the operator was obligated to send reports to under 103.1.[10]

So to whom are operators obligated to send reports under section 103.1? This much seems undisputed: an operator must send reports when the *operator* has no lease, not when there is no lease at all. But, as Chesapeake points out, section 103.1(A) is less clear about who has a right to *receive* reports: the operator must issue reports to owners of "said interests," but section 103.1 refers to "lands," not interests, before using "said interests." Despite the imprecise reference to the antecedent term, the only logical reading is that "said interests" means oil and gas interests in lands for which the operator has no lease. "Said" must refer to something mentioned earlier in the section. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (2002) ("'Said' modifying a noun means 'aforementioned.'"). And what section 103.1 refers to before using "said interests" is lands producing oil or gas on which the operator has no oil and gas lease.

Chesapeake does not point to any other aforementioned interests to which section 103.1 could refer. Instead, it contends the court should look further down in the statute to understand "said interests." Section 103.1(C) says reports must be sent to "each owner of an unleased oil or gas interest" who

---

[9] 1950 La. Sess. Law Serv. 387; 2001 La. Sess. Law Serv. 973 (amending and reenacting the provisions).

[10] It is especially clear that the owners described in section 103.2 are the same owners described in section 103.1 as, after establishing the reporting obligation in section 103.1(A), the legislature went on to describe the mechanics of reporting in subsections 103.1(B)–(D) using shorthand similar to that used in section 103.2: "owner of the unleased interest," "owner of an unleased oil or gas interest," and "owner of an unleased interest."

has requested them, without specifying unleased by the operator. This clarifies, Chesapeake argues, that operators must only provide reports to owners whose interests are entirely unleased.

Chesapeake's interpretation runs into two problems. First, it is contrary to the rule that "courts are bound, if possible, to give effect to all parts of a statute and to construe no sentence, clause, or word as meaningless and surplusage." *Katie Realty, Ltd. v. La. Citizens Prop. Ins.*, 100 So. 3d 324, 328 (La. 2012). If the legislature intended for operators to send reports only to owners who have not leased their mineral interests at all, section 103.1(A) should have referred to lands "upon which *there is* no valid oil, gas, or mineral lease" instead of "upon which *the operator or producer has* no" such lease. The only apparent role for the language the legislature used is to specify to whom an operator is required to send reports. Second, Chesapeake's view is contrary to the meaning of "said" described above: an adjective that refers to something mentioned before. *See Antoine v. Consol.-Vultee Aircraft Corp.*, 46 So. 2d 260, 262 (La. 1950) (holding that a statute's reference to "said Courts of Appeal" "could refer only to the [courts] named specifically in the two preceding sections").[11] The imperfect grammar of using "said interests" to refer back to "lands producing oil or gas" rather than a prior reference to "interests" is a small thing; giving "said" its opposite meaning to refer to a subsequent term in the statute is a big thing. *Cf. Lamie v. U.S. Trustee*, 540 U.S. 526, 534 (2004) ("The statute is awkward, and even ungrammatical; but that does not make it ambiguous on the point at issue."). Section 103.1 thus requires that reports be given to owners of interests on which the operator has no lease. And TDX's

---

[11] Later subsections in a statute can provide additional specificity regarding a statutory right. *See Adams*, 561 F. App'x at 324 (holding that, although section 103.1(A) says operators "shall" provide reports, without qualification, section 103.1(C) clarifies that the operator is only required to send reports after notice). But "said interests" cannot mean "interests defined below."

reading is the only one that fits the section 103.1 piece of the statutory puzzle together with the section 103.2 piece.

This interpretation is confirmed by a broader view of Title 30. *See* LA. CIV. CODE. art. 12 (noting that when the words of a law are ambiguous, courts must examine the context in which they occur and the text of the law as a whole). Title 30 uses "unleased interests" to mean different things in different chapters. Section 111 states that "[o]wners of unleased mineral interests *and lessees*" are not liable to the operator for materials used in drilling and production in excess of the materials' prevailing market price. LA. R.S. § 30:111 (emphasis added). In that section, the legislature evidently did not include lessees in the term "owners of unleased interests." On the other hand, section 10(A)(2)(e) states that provisions regarding a risk charge will "not apply to any unleased interest *not subject to an oil, gas, and mineral lease*." LA. R.S. § 30:10(A)(2)(e) (emphasis added). The second part of this provision would be superfluous if "unleased interest" always meant an interest not subject to any lease. To determine the meaning of "unleased interests" in a particular provision, we therefore must examine the context. Like sections 111 and 10(A)(2)(e), section 103.1(A) contains clarifying language: an operator shall send reports when *the operator* has no lease. Further, section 103.1 is directed to the operator regarding *the operator's* obligations, and section 103.2 explains when *an operator* forfeits the right to demand contribution. Both provisions are addressed to the operator, and it makes sense that they would use "unleased interest" to mean interests unleased by the operator. In contrast, section 111 is addressed to owners and lessees regarding those parties' obligations. In that context, there is no reason to believe "unleased interests" would mean interests unleased by the operator.

TDX's reading of the statute is also consistent with the reason for requiring operators to provide the accounting. LA. CIV. CODE art. 10 (stating

13

that when a statute is susceptible to different meanings, courts must select the meaning that best conforms to the purpose of the law). Forced pooling allows the operator to extract oil and gas without the consent of others holding mineral interests in the same unit. When this happens, lessees, like other owners of oil and gas interests, have a right to benefits and a duty to contribute. But nonoperators lack access to the data showing the well production and costs in which they share. Sections 103.1 and 103.2 address this information asymmetry by giving lessees, like all nonoperating owners who have not contracted with the operator, an accounting of what the operator is doing. This court has recognized that, under 103.1, a "report has to relate the cost to the benefit: it must tell the unleased mineral owner what it is getting for its money." *Brannon Props., LLC v. Chesapeake Operating, Inc.*, 514 F. App'x 459, 461 (5th Cir. 2013). Lessees need this information just as much as other owners of oil and gas interests, as the statute apparently does not provide an alternate mechanism for lessees to get this information.[12] Indeed, *XXI Oil & Gas* found that, given the lessee's rights and obligations in a unit well, a lessee "has a serious stake in the reliability of the statement" required by section 103.1 and is entitled to sworn statements as "[a]n unsworn statement leaves mineral lessees . . . vulnerable to a degree that this statute seeks to prevent." 124 So. 3d at 535.

---

[12] The district court thought that lessees like TDX can find out the information by disputing the calculation of unit well costs pursuant to LA. R.S. § 30:10(A)(2)(f), and requesting that the Commissioner hold a hearing to determine proper costs. *TDX Energy*, 2016 WL 1179206, at *7 n.10. There is no reason to believe the legislature intended for lessees, unlike other owners of oil and gas interests, to regularly institute proceedings with the Commissioner in order to understand the calculation of costs. Further, this remedy is unlikely to be effective. The Commissioner has rarely exercised authority under section 10(A)(2)(f) to resolve a dispute regarding the calculation of unit costs. Asprodites, *supra*, at 546.

14

No. 16-30450

The district court thought that the "legislature well may have intended to provide greater protections for land owners who typically are not as sophisticated as, or have the available resources of, individuals or entities that procure mineral leases." *TDX Energy,* 2016 WL 1179206, at *6. Title 30 does provide some extra protection to completely unleased owners. They are not subject to a risk charge. LA. R.S. § 30:10(A)(2)(e). That makes sense, as an unsophisticated owner may lack resources to contribute to drilling costs up front. But there is no apparent reason to treat lessees differently when it comes to reports. If anything, lessees may have a greater interest than unleased owners in timely disclosures from operators, as lessees are often under an obligation to promptly pay royalties to their lessors.

Chesapeake argues that our interpretation of "said interests" leads to the absurd result of requiring operators to report to owners of any interest in the land, even those with no obligation to contribute to drilling expenses or right to benefit from production. But section 103.1 is concerned with interests in "lands *producing oil or gas*," and its title specifies that the section deals with operators' reporting requirements regarding "mineral interests." 2001 La. Sess. Law Serv. 973. This "do[es] not constitute part of the law" but does "provide some aid in interpreting legislative intent." *Adams*, 561 F. App'x at 326 (internal quotation marks and citations omitted). In context—under a title referring to mineral interests, with provisions relevant only to such interests—section 103.1 refers to owners of oil and gas interests, not of any interest in the relevant lands. Further, an operator is not required to produce reports unless they are requested, *id.* at 325, and we see little reason why owners with no interest, or only a passive interest, in production would make the effort of requesting them. Finally, the remedy provided for failure to produce reports is that the operator forfeits the right to demand contribution for the costs of

15

drilling, a remedy that cannot apply to owners without an obligation to contribute to such costs.

We thus are not convinced that *XXI Oil & Gas* takes an erroneous view of the statute. The most natural reading of sections 103.1 and 103.2 is that operators forfeit their right to contribution when they fail to send timely reports to lessees with oil and gas interests in lands upon which *the operator* has no lease, and that interpretation is most consistent with the statute's context and purpose.

**B.**

Chesapeake alleges that even if sections 103.1 and 103.2 provide a remedy for lessees, applying them in that way would violate Article III of the Louisiana constitution. That Article dictates that "[e]very bill . . . shall be confined to one object" and "contain a brief title indicative of its object." LA. CONST. art. III § 15(A). The purpose of this requirement is to "give the legislature and the public fair notice of the scope of the legislation" and "defeat deceitful practices of misleading the legislature into the passage of provisions not indicated by the title of the bill." *Bazley v. Tortorich*, 397 So. 2d 475, 485 (La. 1981). According to Chesapeake, the brief title of the act enacting sections 103.1 and 103.2 did not indicate its object if it applied to lessees, because it referred only to "reporting requirements of operators and producers to owners of unleased mineral interests."[13] Act No. 973, 2001 La. Leg.; *see also Bazley*, 397 So. 2d at 485 (noting that an act's title is the brief description beginning with "[t]o amend and reenact").

---

[13] The brief title reads: "to amend and reenact R.S. 30:103, 103.1 and 103.2, relative to reporting requirements of operators and producers to owners of unleased mineral interests; to provide for exceptions; to provide for quarterly reporting of the amount of and price received for production and occasional costs of operations; to provide for method of transmittal of reports and notices; to provide for time limits for payments; and to provide for related matters."

16

But the title of Act 973 provided sufficient notice of its object. Regardless of the meaning of the phrase "unleased mineral interests," the legislature used it throughout the Act. The title of an act "is not to be strictly construed, but rather liberally construed to effectuate the legislative purpose of the statute." *Doherty v. Calcasieu Par. Sch. Bd.*, 634 So. 2d 1172, 1174–75 (La. 1994) (reversing the trial court's holding that, because the title of an act "use[d] the permissive term 'authorize,' and the body of the act use[d] the mandatory term 'shall', the title violate[d] the title-body clause"); *Bazley*, 397 So. 2d at 486 (specifying that a title need not "be an index to the contents of the act"; it is sufficient that "the object be fairly stated, although it be expressed in general terms").

Chesapeake identified three cases in which the Supreme Court of Louisiana found titles misleading. One title did not give fair notice when it said the act provided quarters for a parish court, without indicating that it also authorized the parish to charge tax-levying bodies, including school boards, for the costs of collecting any taxes they levied. *Orleans Parish Sch. Bd. v. City of New Orleans*, 410 So. 2d 1038, 1039 (La. 1982). Another gave no "notice that substantial funds were to be transferred annually" from one district to another, an "extraordinary legislative subject." *Terrebonne Parish Police Jury v. Bd. of Comm'rs*, 306 So. 2d 707, 709 (La. 1975). The third said nothing about the fact that an act authorized the establishment of an institution for juvenile offenders in New Orleans. *Jefferson Parish v. Louisiana Dep't of Corr.*, 254 So. 2d 582, 597 (La. 1971). The titles in these decades-old cases omitted that the acts they described addressed matters generally subject to intense public scrutiny: public money and the location of a penal institution. This small number of cases finding titles misleading, and their subject matter, shows they are the exception and not the rule. Given the liberal construction courts must give titles, a title which gave notice that an act dealt with operators' reporting

No. 16-30450

requirements cannot fail because it did not specify every party to whom they must report.

**IV.**

Chesapeake's counterclaim asserts that TDX is required to pay a risk fee under section 10(A) because TDX did not make an election regarding the risk fee under that provision. The version of section 10(A) that was in effect at all times relevant to this case stated that:

> Any owner drilling or intending to drill a unit well, . . . on any drilling unit heretofore or hereafter created by the commissioner, may . . . notify all other owners in the unit of the drilling or the intent to drill and give each owner an opportunity to elect to participate in the risk and expense of such well.

LA. R.S. § 30:10(A)(2)(a)(i). According to that section, the notice must contain: (1) an "estimate of the cost of drilling, testing, completing, and equipping the unit well"; (2) the "proposed location of the unit well"; (3) the "proposed objective depth of the unit well"; and (4) "[a]ll logs, core analysis, production data, and well test data from the unit well which has not been made public." *Id.*

When a notified owner elects not to participate in the risk and expense of the unit well, the operator is entitled to recover out of production the nonparticipating owner's "share of the actual reasonable expenditures incurred in drilling, testing, completing, equipping, and operating the unit well, including a charge for supervision, together with a risk charge, which risk charge shall be two hundred percent of such tract's allocated share of the cost of drilling, testing, and completing the unit well." *Id.* § 30:10(A)(2)(b)(i). An owner not notified still bears its tract's share of "actual reasonable expenditures," but owes no risk charge. *Id.* § 30:10(A)(2)(b)(ii). As discussed above, the risk charge also does not apply to "any unleased interest not subject to an oil, gas, and mineral lease." *Id.* § 30:10(A)(2)(e).

18

No. 16-30450

TDX obtained two of its twenty-one leases, and all were dated retroactively to, before the well was completed.  But no lease was recorded until the unit well was completed.  In Louisiana, "[a]lthough the lease may have retroactive effects between the parties to it, the document is a nullity with respect to third parties until recordation." *King*, 673 So. 2d at 1340.  The relevant lease date for the purposes of determining Chesapeake's rights and obligations under section 10(A) is therefore the date the leases were recorded. *Id.* (finding an interest "unleased for the purposes of La. R.S. 30:10(A)(3) . . . until the date of recordation of the [lessee's] lease," because at the time the operator's obligation arose—the sale of unit production—the lease had not been recorded); *see also* LA. R.S. § 30:10(A)(2)(h) ("The owners in the unit to whom the notice . . . may be sent, are the owners *of record* as of the date on which the notice is sent." (emphasis added)).  Thus, as to Chesapeake, when the well was completed, the oil and gas interests for the relevant tracts were not subject to oil and gas leases, and there was no reason for Chesapeake to send notice to the owner of record, as it had no chance of obtaining a risk fee.

Chesapeake thus sent notice for the first time after TDX's interests were recorded.  Unfortunately for Chesapeake, this notice was untimely.  Drilling was complete.  The provision in effect at the time said that an "owner drilling or intending to drill" must notify other owners of "the drilling or the intent to drill" in order to receive a risk charge.  The use of the present and future tenses shows legislative intent that the provision did not apply to completed wells. *See Benjamin v. Zeichner*, 113 So. 3d 197, 203 (La. 2013) (finding the legislature's use of the present tense meaningful).  Two exceptions to this temporal limit also indicate that there was such a limit: (1) an owner "who drilled or was drilling" a well could provide notice "as if a unit well were being proposed" if a drilling unit was created around a well "already drilled or drilling"; and (2) an owner who "had drilled the unit well" could provide notice

19

"as if a unit well were being proposed" if a unit was revised to include additional tracts. LA. R.S. § 30:10(A)(2)(c)–(d). When a unit was revised to include additional tracts, the operator could only send notice to the owners of added tracts, not owners previously included in the unit, indicating that the time for sending notice to included owners had elapsed. *Id.*

Chesapeake argues that the time to send notice was not limited because the notice was required to contain production data, and production data is not available until a well is drilled. But section 10(A) did not require the notice to contain production data in all circumstances. It allowed owners "intending to drill" to send a notice, and the notice was required to include "all . . . production data . . . from the unit well which ha[d] not been made public." That means if there was no such data, the notice did not need to include it. The production data requirement also was not surplusage: the exceptions discussed above allowed notice to be sent in certain circumstances (not present here) after a well was completed, and production data would be available in those circumstances. Further, other notice requirements would be illogical if the well were completed when notice was sent. The notice was required to include an "estimate" of drilling costs and the "proposed" location and depth of the well.

The current version of section 10(A) fixes the problem we face. It says that an owner "drilling, intending to drill, *or who has drilled* a unit well" may send notice. LA. R.S. § 30:10(A)(2)(a)(i) (effective June 13, 2016) (emphasis added). The addition of the last category shows it is not included in the first two. The notice also must now contain an "estimate *or the actual* amount" of drilling costs and the "proposed *or actual*" location and depth of the well. *Id.* (emphasis added). And, "[i]n the event that the well is being drilled or has been drilled at the time of the notice," production data which has not been made public must be included. *Id.* To give meaning to the current statute, we must give interpretative significance to these differences.

20

Chesapeake calls these changes merely a clarification of prior legislative intent. But between the version of section 10(A) that applies to this dispute and the current version, the legislature enacted a different version which said an "owner drilling or intending to drill" must notify other owners "prior to the actual spudding" of the well to receive a risk charge. LA. R.S. § 30:10(A)(2)(a)(i) (effective from August 1, 2012, to June 12, 2016). That version made explicit that the production component of the notice was only applicable "[i]n the event the proposed well [wa]s being drilled or drilled at the time of the notice," a condition which, under that version, was explicitly only possible under the two exceptions. The history of these amendments confirms what the new language indicates: in enacting the current version, the legislature charted a new course.

Chesapeake's fallback position urges us to resort to equity, arguing that TDX gamed the system by not recording its leases until the time for Chesapeake to send notice had elapsed. TDX may have discovered a loophole in the law which allowed it to reap the benefits of the unit well without taking on any risk, though TDX contends it did not intend to game the system as it did not begin taking leases in the unit until the day before the well was completed. And Chesapeake did not end up in a worse position than it expected. At the time it drilled the unit well, it knew there were no recorded leases for the acres at issue and did not expect any upfront contribution or risk fee under section 10(A) for those acres. Regardless, as Chesapeake points out, giving TDX any benefit based on a late notice makes little sense: a late notice provides an owner greater information about whether a well will produce enough to merit the risk. When the text of the law is clear, however, the court may not resort to equity. *See* LA. CIV. CODE art. 4; *Brannon Properties*, 514 F.

No. 16-30450

App'x at 460–62.  In this case, the text limited the time to provide notice to before the well was complete.[14]

**\* \* \***

The judgment is REVERSED in part and AFFIRMED in part.  The case is remanded for entry of a judgment consistent with this opinion.

---

[14] Chesapeake points to a case in which we applied equitable principles in interpreting a joint operating agreement including similar notice and risk charge components. *Bonn Operating Co. v. Devon Energy Prod. Co.*, 613 F.3d 532, 533 (5th Cir. 2010).  The agreement provided for notice of "proposed operations," but the operator sent Bonn notice after the well was completed.  *Id.*  We held that even though the language "indicat[ed] that the notice should be sent prior to operations being commenced," Bonn was not harmed by receiving notice after completion and had waived any right to object by making an election.  *Id.* at 535–36.  As the district court held, *Bonn* is not controlling.  It did not interpret a Louisiana statute.  When interpreting a statute, the court may only resort to equity if "no rule . . . can be derived from legislation."  LA. CIV. CODE art. 4.